In re SCHOOL ASBESTOS LITIGATION.

PFIZER INC., Petitioner,

v.

The Honorable James McGirr KELLY, Nominal Respondent,

Barnwell School District No. 45, School District of Lancaster, Manheim Township School District, Lampeter–Strasburg School District, Board of Education of the Memphis City Schools, and a Conditionally Certified Class, Respondents,

Lac D'Amiante Du Quebec, Ltee., Intervenor.

KAISER CEMENT CORPORATION, Petitioner,

v.

The Honorable James McGirr KELLY, Nominal Respondent,

School District of Lancaster, Manheim Township School District, Lampeter–Strasburg School District, Respondents,

Lac D'Amiante Du Quebec, Ltee, Intervenor.

ACandS, INC., Petitioner,

v.

The Honorable James McGirr KELLY, Nominal Respondent,

Barnwell School District No. 45, Board of Education of the Memphis City Schools, and a Conditionally Certified Class, Respondents,

Lac D'Amiante Du Quebec, Ltee, Intervenor.

ASTEN GROUP, INC., Petitioner,

v.

The Honorable James McGirr KELLY, Nominal Respondent,

Barnwell School District No. 45, Board of Education of the Memphis City Schools, and a Conditionally Certified Class, Respondents,

Lac D'Amiante Du Quebec, Ltee, Intervenor.

W.R. GRACE & CO.–CONN., Petitioner,

v.

The Honorable James McGirr KELLY,
Nominal Respondent,

Barnwell School District No. 45, School
District of Lancaster, Manheim Town-
ship School District, Lampeter–Stras-
burg School District, Board of Edu-
cation of the Memphis City Schools,
and a Conditionally Certified Class, Re-
spondents.

ASTEN GROUP, INC., Dana Corporation,
Pfizer, Inc., Pittsburgh Corning Corpo-
ration, and W.R. Grace & Co.–Conn.,
Petitioners,

v.

The Honorable James McGirr KELLY,
Nominal Respondent,

Barnwell School District No. 45, School
District of Lancaster, Manheim Town-
ship School District, Lampeter–Stras-
burg School District, Board of Edu-
cation of the Memphis City Schools,
and a Conditionally Certified Class, Re-
spondents.

GEORGIA–PACIFIC CORPORATION,
Petitioner,

v.

The Honorable James McGirr KELLY,
Nominal Respondent,

School District of Lancaster, Manheim
Township School District, Lampeter–
Strasburg School District, and a Condi-
tionally Certified Class, Respondents.

KAISER CEMENT CORPORATION,
Petitioner,

v.

The Honorable James McGirr KELLY,
Nominal Respondent,

School District of Lancaster, Manheim
Township School District, Lampeter–
Strasburg School District, Respondents.

Nos. 91–1887, 91–1917, 91–1943,
91–1981, 91–2105, 92–1014,
92–1053 and 92–1084.

United States Court of Appeals,
Third Circuit.

Argued June 23, 1992.

Decided Oct. 8, 1992.

As Amended Oct. 23, 1992.

766

Charles R. Bruton (argued), John A. Singer, Piper & Marbury, Rolin P. Bissell, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Pfizer Inc.

Patrick J. Hagan, Kincaid, Gianunzio, Caudle & Hubert, P.C., Oakland, Cal., Daniel J. Ryan, Jr., Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., Thomas W. Kirby (argued), Wiley, Rein & Fielding, Washington, D.C., for Kaiser Cement Corp.

Alfred A. Gollatz, Donna Bailey McCarthy, Mary Anne Taufen, Gollatz, Griffin, Ewing & McCarthy, West Chester, Pa., for ACandS, Inc.

Robert P. Corbin, Deborah M. Knight, German, Gallagher & Murtagh, Philadelphia, Pa., for Asten Group, Inc.

David Booth Beers, Wendy S. White, Richard A. Nagareda, Shea & Gardner, Washington, D.C., for Cassiar Min. Corp.

Frederick B. Lacey, Molly S. Boast, Thomas Fenerty, LeBoeuf, Lamb, Leiby & MacRae, New York City, Edward W. Madeira, Jr., Richard W. Foltz, Jr., Matthew H. Adler, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Lac D'Amiante du Quebec, Ltee.

Denis McInerney, Allen S. Joslyn (argued), Cahill Gordon & Reindel, New York City, for W.R. Grace & Co.–Conn.

Walter S. Jenkins, Sweeney, Sheehan & Spencer, Philadelphia, Pa., John D. Briggs, Marguerite S. Boyd, Robert L. Green, Howrey & Simon, Washington, D.C., for Dana Corp.

Andrew J. Trevelise, Reed Smith & McClay, Philadelphia, Pa., R. Cornelius Danaher, Jr., Albert P. Lenge, Danaher, Tedford, Langnese & Neil, Hartford, Conn., for Pittsburgh Corning Corp.

John H. Lewis, Jr., Joseph B.G. Fay, J. Gordon Cooney, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for U.S. Gypsum Co.

Alan Klein (argued), David Gutin, Leslie Thoman Bradley, Cohen, Shapiro, Polisher,

Shiekman and Cohen, Philadelphia, Pa., for Georgia–Pacific Corp.

Herbert B. Newberg, Harvey S. Kronfeld (argued), Sandra L. Duggan (argued), Roger P. Cameron, Kronfeld, Newberg & Dug-gan, David Berger (argued), Harold Berger, Thomas F. Hughes, David Berger, Attorneys at Law, Arnold Levin (argued), Laurence S. Berman, Levin, Fishbein, Sedran & Berman, Philadelphia, Pa., for class plaintiffs.

## TABLE OF CONTENTS

I. INTRODUCTION .......................................... 769

II. PROCEDURAL HISTORY OF THE OVERALL LITIGATION ... 771

III. GENERAL STANDARDS REGARDING THE AVAILABILITY
 OF MANDAMUS ......................................... 772

IV. THE PETITIONS RELATING TO DISQUALIFICATION ......... 774
 A. Mandamus as a Means to Review a Judge's Failure to Dis-
 qualify Himself or Herself ................................. 774
 B. The Facts Surrounding the Conference on the Hazards of
 Asbestos in Place......................................... 778
 C. Disqualification—Appearance of Partiality ..................... 781
 D. Remedy—Vacatur of Past Rulings?.......................... 785

V. THE PETITION RELATING TO THE EX PARTE FUNDING
 APPROVAL PROCESS...................................... 788

VI. THE PETITIONS TO COMPEL CONSIDERATION OF SUM-
 MARY JUDGMENT MOTIONS DISMISSED AS UNTIMELY ... 791
 A. Procedural History ...................................... 791
 B. Mandamus as a Remedy for Refusal to Consider a Summary
 Judgment Motion on the Merits ........................... 792
 C. Timeliness Requirements for Summary Judgment Motions ... 793

VII. THE PETITIONS REGARDING THE PHASE I TRIAL PLAN ... 795
 A. Trying the Conspiracy and Concerted Action Claims First ... 795
 B. Adjudicating the Case According to the Tort Standards of the
 Strictest Jurisdiction ..................................... 796

VIII. SUMMARY.............................................. 798

---

Before: BECKER, HUTCHINSON, and ALITO, Circuit Judges.

### OPINION OF THE COURT

BECKER, Circuit Judge.

### I. INTRODUCTION

Before us are eight petitions for mandamus brought by various defendants shortly before trial was scheduled to begin in this nationwide products liability class action. The trial, which has been stayed pending resolution of these petitions, will concern over 30,000 school districts' claims that the defendants are liable for expenses incurred in eliminating the alleged danger caused by asbestos-containing products in their school buildings. The class action is founded on diversity jurisdiction and will be adjudicated according to the laws of fifty-four jurisdictions.

Petition No. 91–1887, filed by Pfizer, Inc. and supported by numerous other defendants, challenges the refusal of the district judge, the Honorable James McGirr Kelly, to disqualify himself from the case.[1] Pfiz-

---

1. Except when quoting other opinions, we use "disqualify" rather than "recuse" because 28 U.S.C. § 455, the statute governing this case, uses the former term. Whether or not there was ever a distinction between disqualification and recusal, the courts now commonly use the two terms interchangeably. See, for example, *United States v. Furst,* 886 F.2d 558, 579–83 (3d Cir.1989). The terms have also become synonymous in common usage. See, for example, *Webster's Third International Dictionary of the English Language Unabridged* 1900 (Merriam–

er's petition first notes that Judge Kelly, pursuant to a previously established procedure, approved an ex parte request by the plaintiffs for $50,000 from a settlement fund to support a scientific conference on a key merits issue—the hazards of asbestos in place. The core allegation of the petition is that Judge Kelly attended, and had many of his expenses paid for, the resulting conference, which was an allegedly one-sided event at which most of the plaintiffs' expected expert witnesses presented views similar to those they intended to express at trial.

According to the petition, Judge Kelly acknowledged the resulting appearance of impropriety, but, instead of disqualifying himself, he barred experts who appeared at the conference from providing any expert testimony at trial. Pfizer submits that this remedy is inadequate, and that the sole remedy under 28 U.S.C. § 455(a) for the appearance of partiality is disqualification. Pfizer also claims that Judge Kelly had to disqualify himself under 28 U.S.C. § 455(b) because by attending the conference he obtained personal knowledge of disputed facts.

In its petition, Pfizer asks only that we order Judge Kelly to disqualify himself. Two companion petitions, No. 91–1943 filed by ACandS, Inc. and No. 91–1981 filed by Asten Group, Inc., argue additionally that specific rulings adverse to them, which were issued after defendants first requested Judge Kelly to disqualify himself are tainted by the appearance of partiality and must be vacated. Another petition, No. 91–1917, filed by Kaiser Cement Corp., requests that we order the district court (1) to discontinue its process of approving, ex parte, the class plaintiffs' use of escrowed settlement funds to defray litigation costs and (2) to unseal all the plaintiffs' past applications for use of such funds and the district court's rulings thereon.

Rejecting the contrary contention of the class plaintiffs, we conclude that mandamus is a proper means to force a district

judge to disqualify himself or herself under 28 U.S.C. § 455. Furthermore, although we believe that Judge Kelly acted with integrity at all times, we also believe that the circumstances surrounding his attendance at the conference created an appearance of partiality that required disqualification under 28 U.S.C. § 455(a). A writ of mandamus disqualifying him shall therefore issue.

Such an order inevitably raises the question of what, if any, further remedy would be appropriate. We conclude, however, that none of Judge Kelly's past orders need be vacated at this time. Furthermore, although we recommend that the newly assigned district judge delegate the task of reviewing the plaintiffs' spending requests to a magistrate judge or a special master not otherwise involved in the case, we see no need to abolish the ex parte approval process altogether or to require the unsealing of past funding requests and the court orders approving them.

Two other mandamus petitions, No. 91–2105 filed by W.R. Grace & Co.-Conn. and No. 92–1053 filed by Georgia–Pacific Corp., request that we order the district court to adjudicate the merits of their respective motions for summary judgment. The district court refused to consider those motions on the ground that they were untimely, even though the court had not fixed any deadlines for filing such motions and had not set a firm trial date. We conclude that mandamus is a proper means to require a district court that has refused to consider the merits of an issue to do so. We further hold that a district court may only refuse to consider the merits of a summary judgment motion on grounds of untimeliness if it has previously set reasonable time limits on such motions or if the motion is made less than ten days from a formally fixed trial date so as to violate the ten day requirement of Federal Rule of Civil Procedure 56(c). While the conclusions we reach on these points are holdings because they are immediately binding on the parties be-

Webster 1966) (providing as a definition for recuse: "to disqualify (oneself) as judge in a

particular case").

fore the court and address rulings that otherwise would govern the case (i.e., they are not merely advisory), we realize that we cannot issue a writ of mandamus to a non-party, the newly assigned district judge. Accordingly, no writ of mandamus will issue with respect to the future consideration of the motions for summary judgment.

Finally, two petitions, No. 92–1014 filed jointly by Asten Group, Dana Corp., Pfizer, Pittsburgh Corning Corp., and W.R. Grace ("the joint petition"), and No. 92–1084 filed by Kaiser Cement, challenge the district court's orders governing Phase I of the trial. Under the Phase I plan, the initial issue for trial is whether or not the defendants conspired and/or acted in concert to conceal the dangers of asbestos. The joint petition alleges that the district court lacks jurisdiction to try that issue first because, there having been no determination of liability for the underlying products liability tort, there can be no case or controversy with regard to the defendants' joint and several liability for that underlying tort. The petition also alleges that the Phase I plan would violate the defendants' Seventh Amendment rights because different juries would be called upon to decide inextricably interwoven factual issues.

Kaiser Cement's petition alleges that the district court plans to try this diversity case according to a composite legal standard made up of the strictest standard from each of the jurisdictions (that is, the liability provisions least favorable to plaintiffs), instead of trying the claims from each jurisdiction according to the tort law of that jurisdiction. This scheme was originally suggested by the plaintiffs as a means of making the class action more manageable. Kaiser Cement, however, believes that such a scheme would violate the Supreme Court's ruling in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 814–23, 105 S.Ct. 2965, 2976–80, 86 L.Ed.2d 628 (1985), that due process requires courts hearing multistate class actions to apply the substantive law of a state with a significant interest in having its law applied to a particular claim. Kaiser Cement fears that, even if it won a judgment under the strict-

est-state standard, absent class members from more "lenient" jurisdictions might successfully attack the judgment collaterally on the ground that they had the right to try their claims under their own, more favorable laws.

We conclude that deciding these issues now would be premature since the case will be transferred to a newly assigned district judge who might adopt a different manner of trying the case. We will therefore deny these petitions without prejudice to the petitioners' right to raise these issues should they arise again.

## II. PROCEDURAL HISTORY OF THE OVERALL LITIGATION

This case was first filed in early 1983 and has been before this court numerous times. The district court consolidated what had originally been four separate suits based on diversity jurisdiction (three from Pennsylvania and one from South Carolina), and certified a nationwide opt-out class action for compensatory damages under Federal Rule of Civil Procedure 23(b)(3) and a mandatory class action on punitive damages under Rule 23(b)(1)(B). *In re Asbestos School Litigation*, 104 F.R.D. 422 (E.D.Pa. 1984). On appeal, we vacated the certification of the mandatory class action for punitive damages but, with some reluctance, affirmed the certification of the opt-out class action for compensatory damages. *In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir.1986).

Since then, discovery and pretrial litigation has continued on a massive scale, and the district court has issued hundreds of pretrial orders, several of which have previously come before this court on collateral-order appeals or on petitions for mandamus. Among other things, we have rejected defendants' challenges to the district court's jurisdiction, *In re School Asbestos Litigation*, 921 F.2d 1310 (3d Cir.1990) (denying mandamus petitions seeking to require the district court to dismiss the class action complaints for lack of subject matter jurisdiction), and have refused to decertify the class action, *In re School Asbestos*

*Litigation,* 921 F.2d 1338 (3d Cir.1990) (ruling that mandamus does not lie to force the decertification of a class action when interlocutory appeal is available).[2]

After numerous delays, the case was nearly ready to go to trial in 1991. By September of that year, the district court had reformulated its original plan for the first phase of the trial, deciding to try only whether the defendants conspired or acted in concert to conceal information about the hazards of asbestos-containing products. Other issues, such as the level at which various kinds of friable asbestos are dangerous in school buildings,[3] whether statutes of limitations preclude certain claims, whether plaintiffs can identify particular defendants' products as present in their schools, and whether the defendants' products were defective, were reserved for later phases. In order to keep trial manageable, the district court elected to hold several Phase I trials, each involving about a dozen defendants. At a pretrial conference in early December 1991, the court set February 3, 1992, as the date of jury selection in the first of the Phase I trials.

In the meantime, over the course of several months, six of the current mandamus petitions were filed in this court. On January 17, 1992, after a motions panel of this court referred the mandamus petitions requesting disqualification to a merits panel for disposition, the district court stayed proceedings pending decision on the petitions. In an effort to clear roadblocks to trial in the event that he was not disqualified, Judge Kelly advised the parties to file immediately any other contemplated mandamus petitions. Following this invitation, two more petitions for mandamus were filed. We consolidated the eight petitions into three groups: (1) those relating to

disqualification and the ex parte process of approving plaintiffs' use of settlement funds (discussed in Parts IV and V); (2) those relating to the district court's refusal to consider summary judgment motions relevant to Phase I on the ground of untimeliness (discussed in Part VI); and (3) those relating to the Phase I trial plan itself (discussed in Part VII).

## III. GENERAL STANDARDS REGARDING THE AVAILABILITY OF MANDAMUS

Although we will discuss separately the availability of mandamus relief for each group of grievances in this case, a preliminary summary of the standards generally governing the availability of mandamus is in order.

 Federal courts of appeals have the power to issue extraordinary writs under the All Writs Act, 28 U.S.C. § 1651(a) (1988). As the adjective "extraordinary" implies however, courts of appeals must be chary in exercising that power: "[M]andamus must not be used as a mere substitute for appeal." *Westinghouse Electric Corp. v. Republic of Philippines,* 951 F.2d 1414, 1422 (3d Cir.1991). Mandamus is disfavored because its broad use would threaten the policy against piecemeal appeals. *Kerr v. United States District Court,* 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976). Accordingly, the petitioner must ordinarily have no other adequate means to obtain the desired relief, id., and the petitioner must show a "clear and indisputable" right to issuance of the writ, *Will v. United States,* 389 U.S. 90, 96, 88 S.Ct. 269, 274, 19 L.Ed.2d 305 (1967). Even then, exercise of our power is largely discretionary. *Kerr,* 426 U.S. at 403, 96 S.Ct. at 2124.

**2.** Our other previous published dispositions have been: *In re School Asbestos Litigation,* 842 F.2d 671 (3d Cir.1988) (vacating order requiring association of manufacturers and suppliers of asbestos-containing materials to disclose involvement in this litigation when communicating with any member of plaintiff class or group believed to include a class member or representative thereof); *In re School Asbestos Litigation,* 920 F.2d 219 (3d Cir.1990) (staying appeals against defendant National Gypsum Company

in light of its bankruptcy petition); and *In re School Asbestos Litigation,* 921 F.2d 1330 (3d Cir.1990) (affirming ruling that nonsettling defendants had no standing to challenge a settlement by another defendant). We will discuss relevant unpublished dispositions in our treatment of the individual petitions.

**3.** "Friable" means easily crumbled or reduced to powder.

The traditional use of mandamus has been "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Roche v. Evaporated Milk Association*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). Even under that formulation, however, "courts have not confined themselves to any narrow or technical definition of the term 'jurisdiction.'" *United States v. Santtini*, 963 F.2d 585, 594 (3d Cir.1992). See *Mallard v. United States District Court*, 490 U.S. 296, 309, 109 S.Ct. 1814, 1822, 104 L.Ed.2d 318 (1989). Mandamus may lie to prevent a district court from usurping a power that it lacks and to rectify clear abuses of discretion. *Mallard*, 490 U.S. at 309, 109 S.Ct. at 1822. Mandamus may be especially appropriate to further supervisory and instructional goals, and where issues are unsettled and important. See *Sporck v. Peil*, 759 F.2d 312, 315 (3d Cir.1985); *United States v. Christian*, 660 F.2d 892, 895–97 (3d Cir.1981); *Rapp v. Van Dusen*, 350 F.2d 806, 810 (3d Cir.1965) (in banc).

Although the above considerations are well established, "application of the 'black letter' rules for when mandamus will be issued has not been unwavering." *Maloney v. Plunkett*, 854 F.2d 152, 155 (7th Cir.1988). Some flexibility is required if the extraordinary writ is to remain available for extraordinary situations. "The writ is a safety valve (one of several safety valves, in fact) in the final-judgment rule, and its proper use cannot be wholly reduced to formula." *Id.* Nevertheless, at oral argument in this case, the plaintiffs have insisted that we established a bright-line, procedural rule in *Rapp v. Van Dusen*, our seminal case addressing the procedures to be followed in mandamus cases. There we wrote:

> In view of the extent of relief now afforded by the Interlocutory Appeals Act, 28 U.S.C. § 1292(b), and the princi-

ple which ordinarily limits the writ of mandamus to cases where no other remedy is available, petitions for the writ should allege that an unsuccessful request was made for certification under § 1292(b), or why such an application was inappropriate in the circumstances.

350 F.2d at 813 (footnote omitted).

According to the plaintiffs, we held in *Rapp* that, unless a petitioner seeks certification for an interlocutory appeal under subsection 1292(b) or specifically alleges why certification was not possible, we will not consider a mandamus petition, no matter how meritorious the petition might otherwise be. In this case, no petitioner has sought certification of an interlocutory appeal, and although several of the petitions specifically alleged that interlocutory appeal was not a viable means to secure relief, not all did.[4] However, we do not interpret *Rapp* so rigidly, and observe that neither Federal Rule of Appellate Procedure 21 nor any decision, Rule, or Internal Operating Procedure of this court has codified such a requirement.

The petitioners note that this portion of *Rapp* was technically dictum. We will not ignore it on that ground, for *Rapp* was an in banc decision consciously intended to alter the way mandamus proceedings operate in this circuit. Our primary concern in *Rapp* was to reduce the participation of district judges in mandamus proceedings. The petition at issue there (actually the second petition in that case) was based on an entanglement created by the first petition, which concerned the transfer of the case to another circuit. In response to that first petition, "[t]he Judge had designated the attorneys for defendants as his counsel, had consulted with them concerning his answer to the petitions for mandamus and had made suggestions for change in their draft. He later joined as a petitioner in the application to the Supreme Court for certiorari." *Id.* at 810 (footnote omitted). In the second petition, the petitioners sought to

---

4. Petitions 91–2015 (W.R. Grace), 92–1014 (Asten Group, Dana, Pfizer, Pittsburgh Corning, and W.R. Grace), and 92–1053 (Georgia–Pacific) alleged that relief by interlocutory appeal was impractical. The petitioners in Nos. 91–1887 (Pfizer), 91–1917 (Kaiser Cement), 91–1943 (ACandS), 91–1981 (Asten Group), and 92–1084 (Kaiser Cement) filed post-argument memoranda explaining why, in their view, interlocutory appeal was unavailable or inappropriate.

disqualify the district judge on the basis of the improper appearance created by his association with the opposing party in responding to the first petition.

To avoid the appearance of partiality that arose when the real party in interest (the prevailing party in the district court) consulted with and represented the district judge in mandamus proceedings, we set out a prospective procedure whereby the district judge would be a nominal, as opposed to the actual, respondent where mandamus is sought to secure interlocutory review of the merits of a judicial decision. *Id.* at 812–13.[5] The statement quoted above, evincing a preference for the use of subsection 1292(b), is therefore properly read in connection with, and consistent with, our goal of minimizing district judges' participation as litigants. We note in this regard that one of the respondent's arguments in *Rapp* was that the petitioners should not be heard to complain because they had created the situation themselves by failing to seek review of the transfer through an interlocutory appeal, thereby assuring that Judge Van Dusen would be the sole respondent to the first petition. Id. at 810.

Additionally, we sought by our statement to reduce the frequency of resort to mandamus by reinforcing the general duty of petitioners seeking extraordinary writs to show that alternative means of appeal are inadequate. Our choice of "should allege" rather than "must allege," however, confirms that we did not intend our statement to establish an inflexible pleading requirement.

■ We reiterate our preference for an explanation in the petition for why interlocutory appeal is not an adequate alternative. Where interlocutory appeal seems a practical but untried avenue, we will ordi- narily deny a petition for mandamus. See *In re School Asbestos Litigation*, 921 F.2d at 1342. We decline, however, to dismiss any of the petitions in this case out of hand for failure to address the availability of interlocutory appeal. Rather, we will consider the availability of alternate avenues of redress with regard to each of the petitioners' claims.

## IV. THE PETITIONS RELATING TO DISQUALIFICATION

We now consider the petitions of Pfizer, ACandS, and Asten Group, which request that we direct Judge Kelly to disqualify himself because of his attendance at a conference on the hazards of asbestos in place. The conference, which was sponsored by an organization of scientists called the Collegium Ramazzini, took place in early June 1990 and was entitled "The Third Wave of Asbestos Disease: Exposure to Asbestos in Place. Public Health Control" (the "Third Wave Conference," for short).

### A. *Mandamus as a Means to Review a District Judge's Failure to Disqualify Himself or Herself*

■ Initially, we must determine whether a mandamus petition is a proper means for a court of appeals to review a district judge's refusal to disqualify himself or herself from a case. The plaintiffs contend that *Green v. Murphy*, 259 F.2d 591 (3d Cir.1958) (in banc), and *City of Pittsburgh v. Simmons*, 729 F.2d 953 (3d Cir.1984), hold that mandamus does not lie for that purpose, but that a refusal to disqualify is reviewable only after final judgment. The petitioners respond that even though *Green* and its progeny have held that appeal after final judgment suffices where actual bias is alleged under 28 U.S.C. § 144 (1988),[6] this court has never taken a posi-

---

**5.** We also held that in the rare case where a petition is based on a judge's conduct extrinsic to the merits of a ruling, such as when a judge refuses to rule at all, the judge would remain the actual respondent, and appropriate, interested parties would be allowed to intervene. Id. at 813.

**6.** Section 144 is entitled "Bias or prejudice of judge" and requires a motion for disqualification. It reads:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall

tion on the use of mandamus to enforce the broader command of 28 U.S.C. § 455, which additionally requires disqualification upon the appearance of partiality.

Section 455 is addressed directly to judicial officers, requiring them to act *sua sponte* when confronted with situations requiring their disqualification. Subsection (a) provides:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

Subsection (b), in turn, lists a number of specific circumstances in which a judge is required to disqualify himself or herself. Most relevantly, disqualification is required when there is "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). While the parties may, after full disclosure on the record, waive the grounds of disqualification under subsection (a), a judge may not accept a waiver of the grounds listed in subsection (b).[7]

The petitioners urge us to adopt the consensus position of our sister circuits and hold that mandamus is a proper means of challenging a district judge's refusal to disqualify himself or herself under section 455. As we shall explain, we agree with the petitioners.

Thirty-four years ago in *Green*, this court, sitting in banc, sharply divided over the use of mandamus to rectify the alleged failure of a district judge to disqualify himself for actual bias under 28 U.S.C. § 144.

Chief Judge Biggs, writing for four of the seven judges, refused to consider the merits of the complaint on a petition for mandamus, holding that appeal from final judgment was an adequate means of relief. 259 F.2d at 594. The reach of the majority opinion is somewhat unclear, however. Much of the language appears to endorse a blanket rule that refusals to disqualify under section 144 are not reviewable on mandamus. The case, however, can also be read as a holding "under the circumstances [t]here present." Id. See also id. at 595 (Hastie concurring) ("We understand the majority opinion to say that in extraordinary enough circumstances it might be proper for this court to use mandamus or prohibition to prevent a district judge from arbitrarily or scandalously disregarding his plain duty to disqualify himself from hearing a case under Section 144 of Title 28 of the United States Code, but that such circumstances do not appear in this case.").[8]

*Green* remains the law of this circuit, and this panel may not question it. See Third Circuit Internal Operating Procedure 9.1. Further, contrary to the petitioners' suggestion, our in banc decision in *Rapp v. Van Dusen*, 350 F.2d 806 (3d Cir.1965), did not overrule or narrow *Green*. Rather, it distinguished *Green* on two grounds. First, our opinion in *Green* was premised on the availability of appeal to cure the alleged harm to the petitioner. *Green*, 259 F.2d at 594 ("We think that the remedy which can be afforded the petitioner by appeal is adequate for this court can strike down a judgment of conviction if we should find that the affidavit filed by the petition-

---

proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

7. Subsection (f), added in 1988, contains a narrow exception to mandatory disqualification in certain cases of financial or fiduciary interest that is not relevant here.

8. Judges Hastie and Staley concurred only in the judgment, believing that charges of partiality should receive final adjudication as soon as possible, even via mandamus, in order to bolster public confidence in the courts and to eliminate the tension created by unresolved claims of bias. They would have reached the merits of the petition and voted to sustain the district judge's ruling. Id. at 595–96. Judge Kalodner authored a lengthy and vigorous dissent, asserting not only that the court should have reached the merits on the petition for mandamus, id. at 596–602, but also that it should have required disqualification based on those facts, id. at 602–05.

er was legally sufficient to disqualify Judge Murphy under the provisions of Section 144."). In *Rapp*, however, we explained that if the cases were transferred, as the district judge had ordered, there would be no opportunity to review the final judgment. *Rapp*, 350 F.2d at 810. Second, we acknowledged that the impropriety in *Rapp* had arisen as a result of our own order requiring the district judge to participate as respondent in the earlier mandamus action. We accordingly felt obligated to correct the impropriety that we had caused and "d[id] so in the exercise of our supervisory authority." Id. at 810, 814. Neither ground of distinction applies here.

The petitioners also suggest that our decision to consider the merits in *Rapp* but not in *Green* supports a distinction between petitions brought under section 455, as in *Rapp*,[9] and those brought under section 144, as in *Green*. Neither *Rapp* nor subsequent decisions of this court have either endorsed or rejected such a distinction. The plaintiffs argue against a distinction based on *City of Pittsburgh v. Simmons*, 729 F.2d 953 (3d Cir.1984), where we cited *Green* and held that "a refusal to recuse is reviewable only after final judgment," id. at 954. The petition there, however, did not identify whether the motion for disqualification was based on section 144 or on section 455. Accordingly, our discussion in *City of Pittsburgh* should not be read as having taken any position on section 455 petitions given that *Green* was a section 144 case.

In *Moody v. Simmons*, 858 F.2d 137, 143–44 (3d Cir.1988), without mentioning *Green* or *City of Pittsburgh v. Simmons*, we held that mandamus lay to challenge the district judge's continued nonministerial actions after having announced the necessity of, and his intention to, disqualify himself under section 455. Although *Moody* can be read broadly to state that mandamus is appropriate "to vacate the orders of a judge who acted when he should have recused," id. at 143, because

we did not grapple with our earlier precedents, *Moody* is better read narrowly as authorizing mandamus when a district judge continues to sit despite previously having expressed the intent to disqualify himself or herself.

In short, while *Green* still precludes the use of mandamus to correct a district judge's failure to disqualify himself or herself for actual bias under 28 U.S.C. § 144, we are satisfied that neither *Green* nor our subsequent cases have decided whether mandamus lies to enforce the broader commands of 28 U.S.C. § 455.

The plaintiffs submit that review after final judgment is an adequate remedy for a section 455 violation as well as for section 144. However, we find a crucial difference between the two statutes and will not extend *Green* to the section 455 context. Section 144 concerns the interests of the individual litigant. Section 455, in contrast, concerns a wider range of interests. In addressing the mere appearance of partiality, section 455 addresses not only fairness to the litigants but also the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859–60, 108 S.Ct. 2194, 2202, 100 L.Ed.2d 855 (1988); H.R.Rep. No. 93–1453, 93d Cong., 2d Sess. 5 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355. While review after final judgment can (at a cost) cure the harm to a litigant, it cannot cure the additional, separable harm to public confidence that section 455 is designed to prevent.

We are not alone in our decision not to extend precedents concerning review of section 144 rulings to expanded section 455. Before *SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir.1977) (per curiam), the Seventh Circuit had (like us) taken the minority position that mandamus did not lie to review section 144 rulings. Nevertheless, it ruled in *Morgan* that "the specificity and

---

**9.** *Rapp* concerned an earlier and narrower version of section 455; in 1974, section 455 was substantially rewritten. See *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 858 n.

7, 108 S.Ct. 2194, 2202 n. 7, 100 L.Ed.2d 855 (1988) (quoting earlier version). See generally H.R.Rep. No. 93–1453, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 6351.

legislative intent of section 455 are sufficiently different from section 144 to warrant a departure from our previous position." Id. at 117. We agree.

We also note that Congress's great concern for the public's confidence in the judiciary has led it to adopt 28 U.S.C. § 372(c) (West, 1992) (most recently revised by the Judicial Discipline and Removal Reform Act of 1990, Pub.L. No. 101–650, tit. IV, § 402, 104 Stat. 5122, 5122–23). Under that provision, "any person," even a nonlitigant, may complain to the chief judge of a circuit about the conduct of a judge "prejudicial to the effective and expeditious administration of the business of the courts" or about the judge's mental or physical inability to discharge the duties of office.[10]

Nor do we believe that interlocutory appeal will ordinarily be an adequate remedy for a district judge's refusal to disqualify himself or herself. For a district judge to certify an order under 28 U.S.C. § 1292(b), he or she must

> be of the opinion that such order [ (1) ] involves a controlling question of law as to which [ (2) ] there is substantial ground for difference of opinion and that [ (3) ] an immediate appeal from the order

may materially advance the ultimate determination of the litigation.

All three of those requirements pose obstacles to the use of interlocutory appeal to review a district judge's refusal to disqualify himself or herself.

Perhaps in some cases the necessity of disqualification can be deemed a "controlling question of law," notwithstanding that it is a fact-intensive, somewhat discretionary issue collateral to the merits. Even so, a district judge's refusal to disqualify necessarily indicates a belief that his or her partiality cannot reasonably be questioned. In many, if not all, cases, that will in turn suggest that the district judge believes that there is no "substantial ground for difference of opinion" regarding the need to disqualify. Furthermore, disqualification may slow, not speed, the progress of a case to final judgment. Finally, as a practical matter, some district judges may consider a demand for disqualification as a personal attack (even if the motion is not meant as such) and may, therefore, be less inclined to certify the issue if they believe that disqualification is not required.[11]

■ Accordingly, although we do not rule out the use of interlocutory and final appeals to review disqualification decisions,[12] we also refuse to rule out the use

---

**10.** Such complaints frequently allege judicial bias, and the Washington Legal Foundation, which is not affiliated with any party, has filed a complaint in this case alleging substantially the same conduct as the disqualification petitions. Chief Judge Sloviter dismissed that complaint under 28 U.S.C.A. § 372(c)(3)(A), J.C. No. 91–35 (July 31, 1991). An appeal of that dismissal is currently pending before this circuit's Judicial Council.

**11.** District judges may be more inclined to certify when they *have* disqualified themselves. In *Haas v. Pittsburgh National Bank*, 627 F.2d 677 (3d Cir.1980), for example, a district judge who had disqualified himself certified the following question for interlocutory appeal:
> whether it is impermissible for a district judge to recuse himself where he relies on conduct by counsel, which he finds to be improper and to have created the appearance of unfairness, as the basis for his decision, and where he states that he can remain impartial.

Id. at 680. We exercised our discretion to hear the appeal and held that the district judge could properly disqualify himself in that situation, even if he was not required to do so. See also Wesley Kobylak, *Review of Federal Judge's*

*Grant or Denial of Motion to Recuse*, 64 A.L.R.Fed. 433, 439 (1983) ("Counsel will also note that, while interlocutory appeal is generally not available in the context of recusal motions, the rare cases in which it has been granted are uniformly where the recusal has been granted....").

**12.** The Seventh Circuit has allowed post-final-judgment appeals in cases of actual or imputed bias under 28 U.S.C. §§ 144 and 455(b), but has not permitted them for appearance-of-partiality claims under 28 U.S.C. § 455(a). See, for example, *Durhan v. Neopolitan*, 875 F.2d 91, 96–97 (7th Cir.1989); *United States v. Balistrieri*, 779 F.2d 1191, 1204–05 (7th Cir.1985); *United States v. Murphy*, 768 F.2d 1518, 1539–41 (7th Cir. 1985). The logic of this mandamus-or-nothing position is that reversal of a judgment ought to be based on the parties' own rights, rather than on system-wide concerns for judicial integrity.

Although we agree that *interlocutory* prevention of harm to the public perception of the judicial system is preferable to the partial cure of that harm on final appeal, we also endorse our earlier decisions that have reviewed appearance of partiality claims on final appeal. See

of mandamus petitions on the ground that those other avenues provide a presumptively adequate means of relief. Moreover, we believe section 455 reflects Congress's view that the adjudication of a case by a judge with an actual *or* apparent bias is an "abuse of judicial power," *Roche,* 319 U.S. at 31, 63 S.Ct. at 944, because it is a threat to the integrity of the judicial system. Interlocutory review of disqualification issues on petitions for mandamus is both necessary and appropriate to ensure that judges do not adjudicate cases that they have no statutory power to hear, and virtually every circuit has so held. See, for example, *In re United States,* 666 F.2d 690, 694 (1st Cir.1981); *In re IBM Corp.,* 618 F.2d 923, 926–27 (2d Cir.1980); *In re Rodgers,* 537 F.2d 1196, 1197 n. 1 (4th Cir.1976) (per curiam); *In re Corrugated Container Antitrust Litigation,* 614 F.2d 958, 961 n. 4 (5th Cir.1980); *In re Aetna Casualty and Surety Co.,* 919 F.2d 1136, 1139–43 (6th Cir.1990) (en banc); *SCA Services, Inc. v. Morgan,* 557 F.2d 110, 117 (7th Cir.1977); *Liddell v. Board of Education,* 677 F.2d 626, 643 (8th Cir.1982); *In re Cement Antitrust Litigation,* 673 F.2d 1020, 1025 (9th Cir.1982); *Bell v. Chandler,* 569 F.2d 556,

559 (10th Cir.1978).[13] See also *Mitchell v. Sirica,* 502 F.2d 375, 387–90 (D.C.Cir.1974) (MacKinnon dissenting in case where majority did not reach this issue).[14]

### B. *The Facts Surrounding the Conference on the Hazards of Asbestos in Place*

█ We now describe the facts of this case so as to determine whether section 455 "clearly and indisputably" required the district judge to disqualify himself and hence requires us to issue a writ of mandamus directing him to do so.[15]

The origins of this controversy date to November 1986, at which point Judge Kelly had been presiding over this litigation for more than three years. Dr. Irwin J. Selikoff of the Mt. Sinai School of Medicine in New York City, a noted expert on asbestos-related diseases, invited Judge Kelly to attend a scientific conference on diseases caused by inhaling asbestos. Asbestos-related cases constitute a large percentage of the civil docket in the Eastern District of Pennsylvania, and Judge Kelly took the admirable view that judicial education about the scientific aspects of these cases

*United States v. Furst,* 886 F.2d 558, 579–83 (3d Cir.1989); *United States v. Vespe,* 868 F.2d 1328, 1340–42 (3d Cir.1989). See also *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (affirming the vacatur of a final judgment on a Rule 60 motion for a new trial, even though the claim was based on appearance of partiality under 28 U.S.C. § 455(a)).

13. Presumably the Eleventh Circuit would follow the pre-split precedents of the Fifth Circuit. See *Bonner v. City of Prichard,* 661 F.2d 1206, 1209–11 (11th Cir.1981).

14. In arguing the availability of the mandamus remedy, the petitioners have repeatedly emphasized the extraordinary size and complexity of this megalitigation, which may take several years to try. They point to the colossal waste of judicial and litigants' resources that would result if this court refused mandamus but ruled on appeal that disqualification was required and vacated the judgment and numerous pretrial orders. Our decision that a petition for a writ of mandamus is a proper route of review for refusals to disqualify does not, however, rest on the scale of this particular case.

The petitioners' implied premise is that final appeal is a presumptively inadequate means of review in megalitigation. If we accepted that position, however, every significant interlocutory order in this case would arguably be subject to review on petition for mandamus. That would be an untenable result. Although the extraordinary size and complexity of a case may assist in creating the extraordinary circumstances necessary to invoke mandamus, they are not alone sufficient. Of course, the size and complexity of a case may be relevant in crafting an appropriate order once mandamus is deemed necessary. See Part IV.D (discussing vacatur of orders of disqualified judges).

15. Ordinarily we review section 455 disqualification decisions for abuse of discretion. See, for example, *Jones v. Pittsburgh National Corp.,* 899 F.2d 1350, 1356 (3d Cir.1990). Where the district court's decision involves a purely legal interpretation, however, our review is plenary. See *United States v. Furst,* 886 F.2d at 579–80. Of course, if we determine that the need for a writ of mandamus is "clear and indisputable," then the district court's decision will necessarily also have been an abuse of discretion or a clear legal error.

would improve judicial case management.[16] Because of docket pressures, Judge Kelly declined that invitation. He did, however, express to Selikoff an interest in attending a similar conference in the future.

By Pretrial Order 137, dated August 8, 1988, the district court established a process by which it would approve the class plaintiffs' use of certain escrowed funds from prior settlements to pay for litigation expenses. Under that procedure, the class plaintiffs would apply under seal for installments of up to $50,000. Further distributions would not be authorized until the court had approved an accounting, also filed under seal, for the previous $50,000.[17]

By late fall 1989, the plaintiffs' executive committee had become unhappy with the asbestos industry's sponsoring of what the committee perceived to be one-sided scientific conferences on the dangers of asbestos in place. As a result, the executive committee contacted Selikoff, who agreed to supervise an alternative conference on the dangers of asbestos in buildings and low-level asbestos exposure generally (hereinafter the "Third Wave Conference"). According to Selikoff's proposal, the conference would be conducted under the auspices of the nonprofit Collegium Ramazzini, a society of environmental and occupational health scientists of which Selikoff was president, and speakers would not be paid honoraria.

On December 1, 1989, the class plaintiffs applied under seal (and thus without the defendants' knowledge) for $50,000 from the settlement fund to help finance the proposed conference. The plaintiffs indicated that the conference was to be coordinated by Selikoff and that it would be helpful in supporting the plaintiffs' case.

They emphasized that Selikoff was a world-renowned expert, yet a neutral in asbestos litigation, in addition to their belief that "a balanced view of issues concerning asbestos in buildings is not being presented to the public or scientific community at this time." On December 6, in sealed Pretrial Order 201, Judge Kelly granted the plaintiffs' request. Shortly thereafter, a $50,-000 check was issued, which became the seminal source of funding for the conference.

On February 2, 1990, the plaintiffs' executive committee wrote to Selikoff and encouraged him to send a notice or invitation to Judge Kelly "so that he is advised of the progress and details." The parties dispute whether or not the plaintiffs expected Selikoff to encourage Judge Kelly actually to attend. At all events, on February 15, 1990, Selikoff invited Judge Kelly, on Collegium Ramazzini stationery, to attend and enclosed an announcement describing the conference. The invitation mentioned neither the plaintiffs' role in the conference nor the court's earlier approval of funding for the conference. Selikoff also sent a blind copy to the plaintiffs' executive committee. On February 20, 1990, Judge Kelly accepted Selikoff's invitation. According to Judge Kelly, he had forgotten that the conference was supported by the plaintiffs' settlement funds; rather, he believed that Selikoff was extending a follow-up to his 1986 invitation.[18]

In March and April 1990, the plaintiffs' executive committee supplied the Collegium Ramazzini with the names and research materials of various scientists whom the plaintiffs proposed to call as expert witnesses at trial. Many of these experts were then invited to speak at the Third

---

**16.** The record reflects that at some point Judge Kelly discussed his attendance at such conferences with Judge John P. Fullam, then chief judge of that court and a member of the Judicial Conference Committee on Codes of Conduct. Judge Fullam suggested that attendance would not be problematic as long as the conference was generally open to the public, Judge Kelly's attendance was not used to promote the conference, and the discussion would be useful in court business.

**17.** As we will discuss more fully below, Kaiser Cement Corporation immediately sought a writ of mandamus from this court to stop this ex parte procedure. That petition, however, was denied in an unpublished memorandum opinion. *In re Asbestos Litigation,* 862 F.2d 310 (3d Cir.1988).

**18.** Our exposition of Judge Kelly's positions is grounded in his statements of record and his responses to the various mandamus petitions.

Wave Conference. The plaintiffs' executive committee also supplied the Collegium Ramazzini with the names of various state and federal judges who had been handling asbestos matters. The Collegium Ramazzini in turn invited many of these judges, including Judge Kelly, to attend the conference as guests of the sponsors. Their registration fees were to be waived and their hotel accommodations provided; the judges, however, would have to pay for their own transportation and meals. A number of judges, including Judge Kelly, expressed an interest in attending the conference. On May 2, 1990, the Collegium Ramazzini confirmed to Judge Kelly that it would waive his registration fee and pay for his hotel room.

The Third Wave Conference took place in New York City from June 7 to June 9, 1990, and was attended by Judge Kelly and fourteen other judges. There were fifty-six presentations, with each day's proceedings lasting eight to ten hours. The views expressed were overwhelmingly consistent with the plaintiffs' position, although opposing views were not actively suppressed.[19] Representatives of numerous defendants attended, but did not speak. It is not clear which presentations Judge Kelly attended, although according to his later recollection he was primarily interested in personal injury questions rather than in the property injury questions that are at the heart of the school asbestos litigation. While Judge Kelly spoke with Selikoff, he did not converse with any other conference speakers. Regardless, it is clear that the Collegium Ramazzini (and hence the plaintiffs' settlement fund, at least indirectly)

paid for Judge Kelly's registration fee and two nights' lodging.

In addition, the Collegium Ramazzini issued promotional literature and numerous press releases that trumpeted the appearance of the judges. It also informed the media and the public that the conference was supported by a "grant" approved by a federal court. In late July 1990, counsel for one of the defendants, W.R. Grace, began inquiring about the court "grant." About that time, the plaintiffs filed their list of eighteen expected expert trial witnesses, thirteen of whom had spoken at the Third Wave Conference. If Judge Kelly noticed the overlap, he made no mention of it to the parties. On September 14, 1990, counsel for W.R. Grace wrote to Judge Kelly on behalf of numerous defendants to request an in camera meeting to discuss his role in approving the funding for the conference. On September 19 and 20, 1990, Judge Kelly responded in writing, with copies to all counsel of record, candidly detailing the events as he recalled them, but declining a meeting.

Eventually, through hard-fought discovery and over the course of more than six months, the full details about the conference, including the formerly sealed documents, were revealed. In the meantime, the district court tentatively explored narrowing the focus of the first phase of trial to conspiracy and concerted action and deferring other issues to later phases. One issue that Judge Kelly proposed to drop from Phase I (and later did drop) was the level at which friable asbestos products in place are dangerous, a topic covered at the conference.[20]

19. Some observers charge that scientific conferences have become dueling public relations vehicles in asbestos litigation. See, for example, Joseph Hooper, "The Asbestos Mess," *The New York Times Magazine,* Nov. 25, 1990, at 38, 53 (describing the Third Wave Conference as a counterattack to the 1988 symposium at Harvard University sponsored by industry representatives).

20. We are uncertain what to make of Judge Kelly's statement at a pretrial conference on March 21, 1991, that the hazards of asbestos is a topic "beyond this case." He stated, albeit with explicit tentativeness:

I don't think there is anyone in this courtroom that does not concede that at least Congress and the administrative agencies believe that asbestos is hazardous and I believe the Court can take notice of Congressional legislation, the administrative regulations, generally banning asbestos, pursuant to those regulations, the thousands of court cases throughout the nation which have resulted in awards being made against asbestos manufacturers and suppliers due to injuries sustained by exposure to asbestos.

Therefore, I am not going to get into is asbestos dangerous and at what level. I think we are beyond that. If somebody says a

On April 18, 1991, twelve defendants moved for Judge Kelly's disqualification on the grounds that his partiality could reasonably be questioned and that he had personal knowledge of disputed evidentiary facts. On May 29, 1991, the court held extended oral argument on the motion. At that hearing, Judge Kelly saw his choices as three: (1) disqualify himself; (2) deny the motion and proceed as if nothing had happened; or (3) deny the motion, but, to assuage fears of taint, refuse to allow conference participants to appear as witnesses at trial. On June 17, 1991, in Pretrial Order 318, he selected the third option.

On September 30, 1991, in Pretrial Order 338, Judge Kelly granted in part the plaintiffs' motion for partial reconsideration of Pretrial Order 318. Judge Kelly modified his previous order "to permit Plaintiffs' witnesses who were presented at the conference to testify at trial, providing purely factual information." Memorandum opinion at 6. On October 21, 1991, Pfizer filed its petition for a writ of mandamus with this court seeking to force Judge Kelly to disqualify himself. On October 29, 1991, Kaiser Cement filed a separate petition seeking a writ of mandamus to end the ex parte process of approving the use of settlement funds and to require the unsealing of past funding applications and the rulings thereon. On November 12 and 25, 1991, respectively, ACandS and Asten Group filed their petitions for mandamus seeking both disqualification of Judge Kelly and the vacatur of certain adverse rulings issued after the motion for disqualification had been filed.

## C. *Disqualification—Appearance of Partiality*

 The petitioners argue, as they did before the district court, that the above circumstances required Judge Kelly to disqualify himself under both 28 U.S.C. § 455(a), because "his partiality might reasonably be questioned," and 28 U.S.C. § 455(b)(1), because he has "personal knowledge of disputed evidentiary facts concerning the proceeding." Because we conclude that subsection 455(a) mandated disqualification, we do not decide the more difficult question whether subsection 455(b)(1) also required disqualification.[21]

We emphasize at the outset the nature of our inquiry. The petitioners argue at length that the plaintiffs engaged in a calculated plan to lure Judge Kelly and other judges to a deliberately biased conference in order to prejudice them. The plaintiffs respond at equal length that they expected the conference to be neutral and scientific, and that it was. They assert that the ultimate contents of the conference and invitations thereto were entirely up to the Collegium Ramazzini, and that while they intended Dr. Selikoff to advise Judge Kelly, as approver of the funds, of the progress of the conference, they did not intend him personally to encourage Judge Kelly to attend. Whether plaintiffs' counsel were calculating or merely careless is immaterial. Our role is not to ascribe blame to anyone. Rather, we must determine whether a reasonable person, knowing all the acknowledged circumstances, might question the district judge's continued impartiality.

We are convinced that a reasonable person might question Judge Kelly's ability to remain impartial. To put it succinctly, he

school cannot use asbestos in their building or a school has to take asbestos out of a certain condition immediately and a school has to take asbestos out and be very careful about asbestos ... when they rip the school building down, that's the issue....

Whether the ambient air contains particles of asbestos and whether it's hazardous or not, that's a [great] academic debate, but there is a property damage case, and they have to rip a school building down and repair the schools to get in compliance with the orders of the administrative agencies in pursuance to legislation, that's it.

I do not, at least in this first stage of the case, want to discuss asbestos hazards. It's beyond this case. This is property damage....

**21.** In the district court, the class plaintiffs argued that the defendants' motion for disqualification was untimely. Judge Kelly was uncertain of the standards for timeliness of section 455 motions, but ruled in Pretrial Order 318 that the motion for disqualification was, in any event, timely. The timeliness issue has not been pressed before us.

attended a predominantly pro-plaintiff conference on a key merits issue; the conference was indirectly sponsored by the plaintiffs, largely with funding that he himself had approved; and his expenses were largely defrayed by the conference sponsors with those same court-approved funds. Moreover, he was, in his own words, exposed to a Hollywood-style "pre-screening" of the plaintiffs' case: thirteen of the eighteen expert witnesses the plaintiffs were intending to call gave presentations very similar to what they expected to say at trial. We need not decide whether any of these facts alone would have required disqualification, for, as we shall explain, we believe that together they create an appearance of partiality that mandates disqualification.

Congress enacted subsection 455(a) precisely because "people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864–65, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988). In high profile cases such as this one, the outcome of which will in some way affect millions of people, such suspicions are especially likely and untoward. A reasonable person might suspect that Judge Kelly's plaintiff-subsidized attendance at the "preview" of the plaintiffs' case would have predisposed him toward the plaintiffs' position. Alternatively, others may reasonably believe that because he now knows that the plaintiffs indirectly paid his way, he might be angry at them for compromising him and might overreact to their prejudice.

Any such (perceived) bias could manifest itself in a number of ways. Although Judge Kelly correctly noted that a jury trial has been demanded, section 455 properly makes no distinction between jury and nonjury trials. The district judge in a jury trial must still make numerous pretrial rulings, including crucial summary judgment rulings, and will doubtlessly be called on to make numerous rulings on the qualification of witnesses and on evidentiary matters, not to mention post-trial motions.

We are also concerned that the public may view the conference as having caused Judge Kelly to believe that the case has moved "beyond" the issue of whether and at what level friable asbestos in place is dangerous. The topic of the conference was the danger of low-level asbestos exposure. Judge Kelly subsequently elected to delay trial of the dangerousness of asbestos in place in schools, and his comments at one pretrial conference might be read to suggest that he believed that the defendants' products clearly were dangerous. See note 20. Although it would not necessarily be improper for him to reach that view through the adjudication of record-based motions, assuming that the record supported it, reasonable but suspicious minds might question whether he had already concluded this issue prior to trial and whether his views were influenced by the conference.

We underscore that we are not intimating that Judge Kelly actually harbors any illegitimate pro-plaintiff bias. The problem, however, is that regardless of his actual impartiality, a reasonable person might perceive bias to exist, and this cannot be permitted. See *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) ("Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'" (citation omitted)).[22]

---

**22.** We do not agree with ACandS that Pretrial Order 338 further evidences an appearance of partiality. The plaintiffs urged reconsideration of the portion of Pretrial Order 318 that excluded those who spoke at the Third Wave Conference from appearing at trial at all on the ground that Pretrial Order 318 would hamper the plaintiffs' ability to prove their case. As we understand Pretrial Order 338, Judge Kelly would allow such experts to testify about generally established "background" facts about asbestos but not about the dangers of asbestos in place. The opinion accompanying Pretrial Order 338 reflects that it was merely a minor modification to conform the letter of Pretrial Order 318 with the spirit of the opinion that had accompanied

■ We find it significant that at oral argument and in his opinion accompanying Pretrial Order 318, Judge Kelly recognized that some people could reasonably suspect a taint. He stated that had he known of the connections between the plaintiffs and the conference, he would not have attended. Moreover, invoking what he later described in the opinion accompanying Pretrial Order 338 as his " 'inherent power' to remedy Plaintiffs' counsels' disregard of the integrity of the judicial process," memorandum opinion at 5, he excluded the expert testimony of conference participants. In his original opinion accompanying Pretrial Order 318, he described this ruling as "sensible action ... to eliminate, as much as is possible, any circumstances legitimately viewed by the defendants as potentially prejudicial to their interests in this case." Memorandum opinion at 28. Section 455, however, clearly requires that judges *shall* disqualify themselves where such a taint appears, rather than attempt creative, alternative remedies such as disqualification of witnesses. In any event, we believe that a reasonable person might still suspect a prospective taint notwithstanding the district court's nonstatutory remedy.

The Code of Conduct for United States Judges [23] points to the same result. The language of section 455 was based on the nearly identical language of Canon 3C of the Code, which is reprinted in II Guide to Judiciary Policies and Procedures at I–7 to I–9. See H.R.Rep. No. 93–1453, 1974 U.S.C.C.A.N. at 6353–57. This fact suggests that appearances of partiality are likely if conduct is inconsistent with the related canons of judicial ethics regarding judges' out-of-court associations with actual and potential litigants.

Opinion No. 67 of the Judicial Conference's Advisory Committee on Codes of Conduct interprets Canon 5C(4) (regarding the receipt of gifts) and advises judges that they should not attend educational seminars related to a litigation issue if the sponsor or source of funding is involved, or likely to be involved, in the litigation. II Guide to Judiciary Policies and Procedures at IV–183.[24] The plaintiffs were undoubtedly a primary source of funding for the conference, although Judge Kelly was evidently unaware of the connection at the time.

Likewise, Advisory Opinion No. 17, interpreting Canons 2B (regarding external influence on judges) and 6B (regarding expense reimbursement) of the Canons of Judicial Ethics of the American Bar Association,[25] observes that an appearance of im-

---

it. It was hardly a major change of course suggesting partiality toward the plaintiffs.

We also place little weight on ACandS's further contention that the grant of partial summary judgment to a defendant that did not join the disqualification motion, but denial of partial summary judgment to ACandS, which did join, heightened the appearance of partiality. Nor do we find the similar accusations of Asten Group, which essentially complains about the rejection on the merits of its summary judgment motion, at all weighty.

23. The "Code of Conduct for United States Judges" was initially adopted on April 5, 1973, by the Judicial Conference of the United States, the governing body of the United States Courts. It was originally called the "Codes of Judicial Conduct for United States Judges." At its March 1987 session, however, the Judicial Conference deleted "Judicial" from the Code's name. II Guide to Judiciary Policies and Procedures at I-iii n. 1 (Admin. Ofc. United States Courts, 1990).

24. The Judicial Conference is authorized to issue advisory opinions on the Code of Conduct

for United States Judges. Jeffrey M. Shaman, Steven Lubert, and James J. Alfini, *Judicial Conduct and Ethics* § 1.11, at 18 (Michie, 1990) (citing Resolution of the Judicial Conference of the United States, Sept. 1973). The Judicial Conference has delegated that responsibility to the Committee on Codes of Conduct. II Guide to Judiciary Policies and Procedures at IV-i. At the time Advisory Opinion 67 was issued, the issuing committee was known as the Advisory Committee on Codes of Conduct. When the committees of the Judicial Conference were reorganized in the fall of 1987, "Advisory" was dropped, yielding the committee's present name.

Advisory Opinion No. 67 also stresses that judicial education is generally beneficial, and that judges need not shy away from attending seminars merely because particular views are emphasized.

25. The first 26 published Advisory Opinions were issued prior to the adoption in 1973 of the Code of Conduct for United States Judges. Rather, they interpret the preexisting Canons of Judicial Ethics published by the American Bar

propriety may arise if lawyer organizations identified with a particular viewpoint regularly advanced in litigation pay for a judge's hotel and travel expenses. II Guide to Judiciary Policies and Procedures at IV–33. Because the plaintiffs were the main source of the conference funding and because they maintained a close association with the Collegium Ramazzini for purposes of the conference, a reasonable person could impute the Collegium Ramazzini's subsidization of Judge Kelly's conference expenses to the plaintiffs. This creates an untoward appearance, even if Judge Kelly was wholly unaware of the connection at the time he attended the conference. Indeed, Judge Kelly stated in his opinion accompanying Pretrial Order 318 that had he known the facts, the Code of Conduct for United States Judges would have counseled him not to attend the Third Wave Conference.

That Judge Kelly was unaware in 1990 of the circumstances creating the appearance of impropriety cannot change our conclusion. The Supreme Court has squarely held that a judge need not have had actual knowledge of facts creating an appearance of partiality to violate subsection 455(a). *Liljeberg*, 486 U.S. at 859–61, 108 S.Ct. at 2202–03. As the Court observed, a " 'judge's forgetfulness ... is not the sort of objectively ascertainable fact that can avoid the appearance of partiality.' " Id. at 860, 108 S.Ct. at 2203 (quoting the Fifth Circuit's opinion below). Thus, we cannot assume that a reasonable person would believe that Judge Kelly simply forgot the connection between Selikoff, the conference, and the source of funding for the conference. Even making that assumption, however, we cannot further assume that a reasonable person would believe that this episode will have no prospective effect on the litigation.

■■■ In *Liljeberg*, the Court held that, although it is impossible for a judge to disqualify himself or herself based on something he or she does not know, he or she can and should disqualify himself or herself retroactively upon discovery of the facts that led to the current appearance of partiality. *Id.* at 861, 108 S.Ct. at 2203. By the time of the motion to disqualify in April 1991, Judge Kelly knew the facts that created an appearance of partiality. He should, therefore, have disqualified himself at that time.[26]

We suspect that Judge Kelly chose not to disqualify himself because he felt duty-bound to shepherd this extraordinarily complicated and protracted litigation to its conclusion and out of concern about creating additional delay. These are both laudable sentiments, and we must acknowledge that the newly assigned district judge will face a gargantuan task in becoming familiar with the case. We also recognize that the delay may disadvantage the plaintiffs, although that result is, to some degree, of their own doing. Nevertheless, a district judge has no "duty to sit," and under 28 U.S.C. § 455 he or she may not sit where his or her partiality may reasonably be questioned and the parties refuse to waive that objection. See H.R.Rep. No. 93–1453, 1974 U.S.C.C.A.N. at 6355 (expressing intent to abolish the "duty to sit" gloss on the prior statute). Indeed we believe that this episode is precisely the kind that Congress contemplated in broadening section 455. If Judge Kelly were to continue pre-

---

Association. II Guide to Judiciary Policies and Procedures at IV-i.

**26.** Asten Group and ACandS suggest that Judge Kelly acted improperly when he ruled on motions for summary judgment at a time when the later motion to disqualify him, which those defendants had joined, was still pending. We do not agree. Ordinarily, it will be the better practice to rule on the disqualification motion first, but the litigation proceedings need not grind to an absolute halt every time a party files a motion for disqualification.

In *Moody v. Simmons*, 858 F.2d 137, 143 (3d Cir.1988), we held that once a district judge has decided to disqualify himself or herself, he or she may take no more than ministerial actions. That case, however, does not cover the circumstance of a district judge who, as here, either had not made up his mind or had decided not to disqualify himself. See *Thomassen v. United States*, 835 F.2d 727, 732 (9th Cir.1987) (where disqualification was not warranted, district judge did not err in continuing to consider merits motions while disqualification motion was pending).

siding, the outcome of this massive, important, and widely followed case would be shrouded with suspicion. Accordingly, we are compelled to order Judge Kelly to disqualify himself.

### D. *Remedy—Vacatur of Past Rulings?*

It does not follow, however, that this litigation must return to square one, or even to where it stood on June 6, 1990, the day before Judge Kelly attended the Third Wave Conference. As Justice Stevens wrote for the Supreme Court in *Liljeberg,* "[t]here need not be a draconian remedy for every violation of § 455(a)." 486 U.S. at 862, 108 S.Ct. at 2203–04. The Court observed that "[a]lthough § 455 defines the circumstances that mandate disqualification of federal judges, it neither prescribes nor prohibits any particular remedy for a violation of that duty. Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation." Id. at 862, 108 S.Ct. at 2204.

In *Liljeberg* itself, the Court affirmed the ruling of the Fifth Circuit, which, on a motion under Federal Rule of Civil Procedure 60(b), had vacated the final judgment entered by a district judge who should have disqualified himself. The Court held, however, that such postjudgment relief was neither categorically available nor categorically unavailable for violations of subsection 455(a). Instead, it suggested that in deciding whether to vacate a judgment, courts should "consider [ (1) ] the risk of injustice to the parties in the particular case, [ (2) ] the risk that the denial of relief will produce injustice in other cases, and [ (3) ] the risk of undermining the public's confidence in the judicial process." Id. at 864, 108 S.Ct. at 2205.[27]

Although we are not considering a Rule 60(b) motion, we believe that a similar balancing should inform the decision as to which prior rulings to vacate. We will therefore consider both prejudice to the litigants—the likelihood of actual bias and the harm from upsetting and delaying this massive litigation—and systemic interests—including the likely extent of lost public confidence in the district court's rulings, and the strong public interest in avoiding unnecessary, costly duplication of work and in propelling this case to a speedy and just conclusion.[28]

**27.** The first and third considerations are self-explanatory, and their impact on this case will be discussed in the text. The content of the second consideration, "injustice in other cases," is less clear. The Supreme Court in *Liljeberg* applied that consideration in terms of the effect the decision to vacate the final judgment would have on the future conduct of other judges. The Court concluded that vacating judgment would help prevent injustice in other cases "by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered." *Liljeberg,* 486 U.S. at 868, 108 S.Ct. at 2206. This construction of the second consideration seems to turn it into a tautology; any extra step taken to enforce the provisions of § 455 will have some beneficial effect in encouraging judges not to make the same mistake in the future. At the same time, however, especially where a case has not yet reached a final judgment, the vacatur of past rulings may have a relatively small educational effect compared to the disqualification itself.

Here, there appears to be little risk that the failure to vacate past rulings will cause injustice in other cases. The circumstances in the present case are largely fact-bound and unlikely to arise in future cases. Further, the educative function of the case will largely be served by the ruling on disqualification regardless of whether or not past rulings are vacated. At least one other court of appeals has additionally used the second consideration to evaluate whether the nonvacated decisions are apt to have preclusive effects in a future action. *In re Allied–Signal Inc.,* 891 F.2d 967, 973 (1st Cir.1989). But, here it does not appear that there is any risk that the nonvacated decisions will have a preclusive effect in other cases. As discussed in the text, most of those decisions will be subject to review at the conclusion of the case. Those that might not really be subject to effective review at the conclusion of the case, such as some of the decisions on trial structure, will be subject to reconsideration by the newly assigned district judge. See discussion at pages 786–87.

**28.** Before *Liljeberg,* the Seventh Circuit had held that disqualification under subsection 455(a) runs prospectively from the date of a motion for disqualification, not from the date that an appearance of partiality arose. Under that rule, it vacated only orders rendered after a motion to disqualify was made. See *New York City Housing Development Corp. v. Hart,* 796 F.2d 976, 979 (7th Cir.1986); *United States v. Murphy,* 768 F.2d 1518, 1539–41 (7th Cir.1985). See also *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d

Our earlier cases provide little guidance. In *Moody*, we required the district judge to vacate all orders entered and findings made after the date on which he had announced that he needed to disqualify himself. 858 F.2d at 144. That case was unusual, however, because the district judge on his own motion had recognized and announced the need to disqualify himself but had nevertheless temporarily continued to sit. The date for vacatur was fairly obvious and was administratively unproblematic. *Mims v. Shapp*, 541 F.2d 415, 416–17 (3d Cir.1976), and other cases decided under section 144 have vacated all orders entered after the date of the motion for disqualification, but, as we have noted above, section 144 differs significantly from section 455.

■ Cases from other circuits are of greater help. In particular, some suggest that, especially in complex litigation, vacatur of rulings ought to be as limited as possible while remaining consistent with the purposes of section 455. See, for example, *In re Allied–Signal Inc.*, 891 F.2d 967, 972–73 (1st Cir.1989) (extended dictum that violation of subsection 455(a) would not have justified retrial of phase of megalitigation); *Polaroid Co. v. Eastman Kodak Co.*, 867 F.2d 1415, 1420–21 (Fed.Cir. 1989) (applying *Liljeberg* in a subsection 455(b) case and refusing, as a matter of fairness, to vacate judgment after six and a half years of litigation); *In re Cement and Concrete Antitrust Litigation*, 515 F.Supp. 1076, 1081–82 (D.Ariz.1981) (suggesting that rulings made before discovery of violation of subsection 455(b)(4) ought to remain intact), mandamus denied, 688 F.2d 1297 (9th Cir.1982), aff'd for lack of quorum, 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983). We agree.

Another theme that emerges is that failure to disqualify (and hence failure to vacate a ruling) may be harmless error when a court of appeals will later review a ruling on a plenary basis. See, for example, *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1526–27 (11th Cir.1988) (summary judgment ruling); *In re Continental Airlines Corp.*, 901 F.2d 1259, 1263 (5th Cir.1990) (same). See also *United States v. Vespe*, 868 F.2d 1328, 1342 (3d Cir.1989) (dictum that if district court had abused its discretion in refusing to disqualify, the error would have been harmless because plenary review applied to ruling on motion for judgment notwithstanding verdict). We find this logic persuasive.

■ In this case, we have a wide range of options. We could vacate all orders after the date on which the appearance of partiality arose, which presumably is June 7, 1990—the date on which the Third Wave Conference began. Alternatively, we could vacate all orders after the date on which Judge Kelly was informed of the facts creating the appearance of partiality (and hence should have disqualified himself), which would be approximately September 14, 1990—the date on which several defendants notified him of most of the details. We could also vacate all orders after the date on which certain defendants moved for disqualification, April 18, 1991. Or we could choose to vacate orders qualitatively, rather than chronologically—according to the nexus between the order and the subject of the Third Wave Conference. Finally, we could, as several petitioners suggest, combine the qualitative and chronological approaches. For the following reasons, however, we choose not to vacate any of the district court's orders at this time.

Preliminarily, we note that we do not believe that leaving Judge Kelly's orders in

1287, 1301–02 (D.C.Cir.1988) (following Seventh Circuit); *Leaman v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 825 F.2d 946, 949 (6th Cir.1987) (en banc).

This position had the virtue of clarity, and also of consistency with the Seventh Circuit's position that appearance of partiality injured the public not the litigant and therefore could not be raised on appeal after final judgment. On the other hand, the court's distinction

among actual, presumed, and apparent partiality seems overly simplistic and might, in some cases, undervalue the interest that the parties, as well as the public, have in ensuring that proceedings appear fair.

At all events, under the Seventh Circuit's logic, retrospective relief of the type approved in *Liljeberg* would never be available. Accordingly, *Liljeberg* must be read as overruling the Seventh Circuit's bright line rule.

place will cause any serious injustice to the parties in this case. To the contrary, vacatur of more than a handful of orders would upset tremendously this huge yet fragile litigation, to the severe disadvantage of the plaintiffs and numerous defendants. For example, approximately seventy pretrial orders have been entered since the original disqualification motion was filed. Moreover, according to the plaintiffs' count, various defendants have filed twenty-six motions for summary judgment since Judge Kelly attended the Third Wave Conference, nine of which were granted. Not surprisingly, not a single party responded to our specific request for supplemental briefing on this point by requesting us to vacate all orders entered after even the latest date listed above—April 18, 1991 (the date of the disqualification motion). Rather, they have all asked that we show sensitivity to the complexity of this litigation.

Most of the controversial pretrial orders since the Third Wave Conference have dealt with two types of subjects: summary judgment motions and trial structure.[29] Even if any of the summary judgment rulings were affected by unintentional bias,

those rulings will be subject to plenary review upon final judgment. To vacate all those rulings now and to order full reconsideration by the incoming district judge would entail enormous cost to the parties and to the judicial system with little corresponding gain. Accordingly, we will not do so, especially since we believe that none of Judge Kelly's orders were infected with actual bias.[30]

The largely discretionary orders affecting trial structure are more problematic. Deferential review after final judgment might not cure any prejudice in this regard in the unlikely event that it occurred. We do not think, however, that wholesale vacatur of these rulings is in order. Instead, we will authorize, but not require, the incoming judge to reconsider earlier rulings on these matters at his or her discretion. We believe that this is appropriate in any case since the new judge may bring a different perspective to the case and may have different ideas about how it should be tried. To prevent undue delay, however, the parties should file any motions for reconsideration within thirty days of the assignment of the new district judge.[31]

29. Other types of orders have included administrative orders, orders approving settlements, and orders entering partial final judgments under Rule 54(b). We doubt that these orders will be controversial now, if they ever were, and it would be pointless to vacate them.

One party that has settled and has been the subject of a Rule 54(b) final judgment, Lac D'Amiante du Quebec, Ltee, has intervened in this matter specifically to protect its interests by requesting that we not disturb Pretrial Order 212, which entered a Rule 54(b) final judgment in light of a settlement between Lac D'Amiante and the class. Pretrial Order 212 was dated February 16, 1990, nearly four months before the Third Wave Conference and four days before Judge Kelly accepted Selikoff's invitation. We affirmed that judgment on appeal in *In re School Asbestos Litigation*, 921 F.2d 1330, 1332 (3d Cir.1990), and certiorari was subsequently denied, —— U.S. ——, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1992). We agree with Lac D'Amiante that there was no appearance of partiality in Judge Kelly's approval of its settlement, and no basis has been suggested to challenge that judgment collaterally under Rule 60(b).

30. Petitioners ACandS and Asten Group state, without citing any authority, that it is "axiomatic" that we must at least vacate the orders denying their motions for summary judgment. We

know of no case after *Liljeberg* that states such a postulate. Further, we are not persuaded that there was any actual bias in Judge Kelly's rulings on those motions or that the appearance of partiality was significantly greater with respect to them.

Kaiser Cement has proposed that we simply remand the case and have the new district judge determine which rulings to vacate under the factors outlined in *Liljeberg*. If we followed that course, the same questions would return to us on appeal or on yet another mandamus petition. We therefore believe it important to give the district court guidance on this troublesome question now.

31. Pfizer, ACandS, and Asten Group have suggested that we authorize the parties to move within thirty days for de novo reconsideration of any orders after a cutoff date, and that we provide the district judge with guidelines for deciding whether to reconsider, including: (1) the nexus between the order and the appearance of impropriety; (2) whether the order was entered before the date of the disqualification motion; (3) whether the party seeking reconsideration timely challenged the order; and (4) whether the order was appealed or appealable. Although this proposal is in many ways attractive, we fear that it would lead to excessive collateral

Finally, we return, as we must, to the keystone of section 455: public confidence in the judicial system, both in the particular case and in general. Our prospective disqualification of Judge Kelly should guarantee public confidence in the critical trial and post-trial rulings. The availability of later plenary review of the disposition of summary judgment motions and our authorization of reconsideration of discretionary trial structure motions should be adequate to assure public confidence in past rulings without needless disruption of this very important litigation. Vacatur of hundreds of past rulings might arguably be the most cautious course, but we believe that that is unnecessary and would be undesirable in these circumstances.

## V. THE PETITION RELATING TO THE EX PARTE FUNDING APPROVAL PROCESS

We now consider whether to direct the newly assigned district judge to discontinue the ex parte process currently in place for approving the class plaintiffs' use of escrowed settlement funds and whether to order the unsealing of the previous ex parte communications.

Petitioner Kaiser Cement notes that the only sealed information that has been released concerns the funding for the Third Wave Conference. It argues that the plaintiffs' request for that funding contained forbidden ex parte advocacy on the merits and that Judge Kelly's attendance at the conference would never have happened if all submissions had been on the public record. Kaiser Cement believes that the ex parte approval process creates the appearance of an alliance between the district court and the plaintiffs and will inevitably lead to further improper advocacy by the class plaintiffs.

Before reaching the merits of the petition, however, we must first decide whether this issue is properly before us. For many of the same reasons previously discussed, we believe that in extreme cases mandamus may be a proper means to prevent a district judge from continuing to engage in clearly improper ex parte communications with a litigant. If necessary, we would in such circumstances issue a writ as part of our "responsibility for the orderly and efficient administration of justice within the circuit." *Rodgers v. United States Steel Corp.*, 508 F.2d 152, 161 (3d Cir.1975).

In 1988, Kaiser Cement raised a substantially similar challenge to Pretrial Order 137 on both an appeal and a petition for mandamus. In a brief, unpublished memorandum opinion, we dismissed the appeal as interlocutory and denied the petition for mandamus. With regard to the mandamus petition, we stated:

> The district court must of necessity create an administrative machinery for the distribution of a settlement fund. We do not find that the order permitting ex parte communications with respect to that fund, in which Kaiser has no interest, is likely to cause Kaiser a grave injustice, or that the order reflects a clear error of law. If the speculative prejudice to which Kaiser refers should transpire it can be addressed in an appropriate motion and an appeal [from] a final judgment.

*In re School Asbestos Litigation*, 862 F.2d 310 (3d Cir.1988).

The plaintiffs submit that our earlier opinion is binding as the law of the case.[32] Kaiser Cement replies that our earlier opinion merely ruled that its claim was unripe until it could demonstrate actual prejudice, as opposed to the purely speculative prejudice it then alleged. Accordingly, Kaiser Cement now asserts that the submissions

litigation over whether a particular order met the criteria, even apart from the merits of the order reconsidered.

**32.** Because our earlier opinion was not published, it is not of precedential value for any other case. See Third Circuit Internal Operating Procedure 9.1 (holding of *published* opinions bind-

ing on subsequent panels). The law of the case doctrine, however, applies, as our earlier opinion was in this same litigation. See generally James Wm. Moore, Jo Desha Lucas & Thomas S. Currier, 1B *Moore's Federal Practice* ¶ 0.404[1] (Matthew Bender, 2d ed. 1992).

regarding the Third Wave Conference, which only an unusual series of events caused it to discover, illustrate actual improper advocacy and, thus, prejudice.

We are satisfied that the law of the case doctrine does not preclude us from considering the merits of Kaiser Cement's petition. While our earlier memorandum opinion suggested that appeal from final judgment was the ordinary means to request relief from actual prejudice, we did not have any reason to consider the possibility of a later petition based on materialized harm. The filings sealed under Pretrial Order 137 were not to have been disclosed until the end of this litigation; accordingly, we could not have anticipated that the defendants could prove actual prejudice before that time. For the reasons that follow, however, we decline to issue the requested writ.

 At the outset, we reaffirm our earlier view that the approval process is not inherently impermissible because it necessarily involves ex parte communications. For obvious reasons of adversarial fairness, ex parte communications between judge and litigant are strongly disfavored. They are tolerated of necessity, however, where related to non-merits issues, for administrative matters, and in emergency circumstances. See, for example, *United States v. Thompson*, 827 F.2d 1254, 1258–59 (9th Cir.1987) ("[S]ituations where the court acts with the benefit of only one side's presentation are uneasy compromises with some overriding necessity, such as the need to act quickly or to keep sensitive information from the opposing party. Absent such compelling justification, ex parte proceedings are anathema in our system of justice...." (footnote omitted)); *United States v. Skulsky*, 786 F.2d 558, 561 (3d Cir.1986) (affirming denial of evidentiary hearing on issue of ex parte communications because record clearly indicated that the ex parte communication concerned "the procedural question of which forum should determine whether Rule 6(e) had been violated," and, thus, could not have been prejudicial to the defendants).

In this case, Judge Kelly believed it necessary to create an ex parte process to administer the settlement fund, a fund in which the nonsettling defendants had no interest. He also believed that counsel for the class plaintiffs should not have to wait until the long-distant conclusion of this litigation for reimbursement of their reasonable expenses. We continue to believe that Pretrial Order 137 did not, on its face, constitute a clear error of law requiring interlocutory correction by writ of mandamus.

 Therefore, we reiterate that to be entitled to relief Kaiser must demonstrate that prejudicial ex parte advocacy, as opposed to administratively necessary ex parte communication, is likely to occur under the mechanism of Pretrial Order 137. Kaiser Cement submits that the plaintiffs' December 1, 1989, request for conference funds was such forbidden advocacy and suggests that more of the same has occurred and will occur if we do not put a stop to it. We agree with the district court, however, that Kaiser Cement overstates the plaintiffs' supposed abuse of the process.

Paragraph 4 on page 2 of the plaintiffs' December 1, 1989, application reads:

Plaintiffs believe that a balanced view of issues concerning asbestos in buildings and related matters is not being presented to the public or the scientific community at this time. (See Exhibit A letter dated November 17, 1989 from the National School Board Association to Herbert B. Newberg and David Berger co-lead counsel for plaintiffs) Funding is lacking to bring together internationally-acclaimed scientists to discuss the results of recent studies on building-exposed populations and other matters.

The referenced letter described a December 1990 symposium on "Health Aspects of Exposure to Asbestos in Buildings" that was held at Harvard University. According to the letter, that symposium had been sponsored in part by the Safe Buildings Alliance, a lobbying organization associated with the defendants in this litigation, and most of the speakers were acting as expert

witnesses for or consultants to the defendants. The letter lamented the wide media coverage of the Harvard conference, which it considered a closed conference, and, in effect, suggested that the plaintiffs sponsor a counter-conference to present *"unbiased* scientific research" (emphasis in original). The letter suggested Dr. Selikoff as an organizer.

Although Kaiser Cement considers this submission to be an outrageous partisan attack, we agree with Judge Kelly, who wrote:

> Although Plaintiffs' assertions that a previous academic conference was biased in favor of the asbestos industry may be viewed liberally as an indirect general attack on the positions advocated by Defendants in this matter, I do not find that there has been any ex parte advocacy of views on the actual merits of this litigation....

Memorandum opinion accompanying Pretrial Order 316 at 6 (June 10, 1991). We believe that the class plaintiffs were attempting in good faith to persuade the court to grant a legitimate request, not to engage in improper, gratuitous attacks on the defendants. To justify spending the funds, the plaintiffs had to explain why the ordinary processes of scientific symposia and publications were not sufficient. What minimal "advocacy" there was was obviously harmless.

Out of caution, however, we have reviewed in camera *all* of the plaintiffs' past sealed submissions and the district court's sealed rulings thereon, which total thousands of pages. Almost none of the submissions could reasonably be viewed as advocacy. The vast bulk of the materials involve bills for photocopying, deposition expenses, payments to experts, and so forth. A few of the bills list particular articles that were to be copied or reviewed by expert witnesses. That, however, hardly strikes us as advocacy of the contents of those articles, and we highly doubt that Judge Kelly viewed them as recommended reading.

The only two items that seem to us even remotely objectionable are: (1) a rather technical summary of the results of a study on the dangers of asbestos that was attached to a bill therefor; and (2) a letter claiming litigation expenses that, in another portion, referred to a defendant's alleged discovery abuses and suggested that a motion for sanctions under Rules 11 and 37 should be filed. Although ideally the plaintiffs should have redacted the offending portions, Judge Kelly undoubtedly paid little attention to these items buried in the middle of sizeable submissions. Further, the research report is quite limited in scope and is essentially inconclusive. Moreover, the exhibits were being offered not on the merits of the case but as evidence of legitimate expenses on behalf of the class. We do not believe either instance illustrates an effort on the part of the plaintiffs to exercise ex parte influence over the district court.

We thus find no reason to unseal past submissions or rulings at this time or to disband the procedure of sealed filings altogether. Judge Kelly will no longer be presiding over the case, and hence no prejudice from any improper past advocacy can occur. Moreover, we agree with Judge Kelly that the plaintiffs' litigation expenses are, at this stage, none of the defendants' business. Disclosing the documentation of the plaintiffs' costs would reveal elements of the plaintiffs' litigation strategy and might advise the defendants' of the plaintiffs' financial position. This would provide the defendants a potential strategic advantage to which they are not entitled.

Nevertheless, these three isolated mishaps do suggest that the newly assigned district judge ought to avoid personally reviewing the submissions. Although we will not issue a writ of mandamus, we strongly urge the incoming district judge to delegate for now the responsibility of approving the plaintiffs' litigation expenses to a magistrate judge or special master not otherwise involved in the litigation. See *Manual for Complex Litigation, Second* § 24.21 (West, 1985); id. at § 24.13; James Wm. Moore & Jo Desha Lucas, 5A *Moore's Federal Practice* ¶ 53.02 at 53–67 (Matthew Bender, 2d ed. 1992). See also Feder-

al Rule of Civil Procedure 53 (provisions governing the appointment of special masters). We further note that Judge Kelly has already established sensible guidelines, and auditors have recently suggested several improvements to the process that the new presiding judge may wish to incorporate.

In sum, to promote efficient administration of the fund, yet to assuage the fears of the defendants and to avoid any appearance of impropriety, we suggest that the new presiding judge avoid personally reviewing the sealed submissions until the end of litigation, at which time he or she can resolve any remaining disputes over the submissions.

## VI. THE PETITIONS TO COMPEL CONSIDERATION OF SUMMARY JUDGMENT MOTIONS DISMISSED AS UNTIMELY

We next consider Petitions Nos. 91–2105, by W.R. Grace, and 92–1053, by Georgia–Pacific, both of which allege that the district court wrongly dismissed their motions for partial summary judgment as untimely. We believe that this issue remains ripe notwithstanding our decision regarding the vacatur of past pretrial orders. We begin by outlining the relevant procedural history.

### A. *Procedural History*

In Pretrial Order 235, filed May 17, 1990, the district court ordered that trial be divided into various phases covering different issues, and ruled that Phase I would include the following:

A. The level at which various kinds of friable asbestos, in various forms, [are] hazardous in school buildings.

B. Defendants' knowledge of the health hazards of asbestos.

C. Defendants' failure to properly warn or test.

D. Defendants' fraudulent concealment of knowledge of the dangers of asbestos.

E. Defendants' conspiracy to suppress knowledge of the dangers of asbestos.

F. Punitive damages.

G. Common defenses.

As discovery and pretrial motions practice dragged on, however, the district court decided to limit Phase I further. In Pretrial Order 306, dated April 18, 1991, it ordered all pending motions relating to non-conspiracy counts held in abeyance and requested the parties to withhold future motions of that type. On September 5, 1991, the district court issued Pretrial Order 331 modifying Pretrial Order 235 by limiting the initial trial to the issue of "whether any or all of the defendants conspired or acted in concert to fraudulently conceal from Plaintiffs information concerning the dangers of asbestos."

Pretrial Order 331 also ordered the plaintiffs to submit, within twenty days, a list identifying the defendants against which they intended to proceed in Phase I and the factual allegations against each such defendant. The defendants were told that they "may respond to plaintiffs' list" within fourteen days of service. The court's order did not specify that a "response" was required or that it should be in the form of a motion for summary judgment. On September 25, 1991, the plaintiffs duly submitted their list of "core defendants" and the allegations regarding each. That list included W.R. Grace but did not include Georgia–Pacific. On October 11, 1991, W.R. Grace filed a timely response contesting in detail the plaintiffs' allegations. The response, however, did not constitute a formal motion for summary judgment. Georgia–Pacific, not having been named by the plaintiffs, had no reason to respond and did not do so.

Recognizing the practical difficulties of a fifty-defendant conspiracy trial, the district court issued Pretrial Order 342, dated October 25, 1991, directing the plaintiffs and the defendants to select ten preferred defendants from an attached list of twenty-two "identifiable defendants" for the first of multiple Phase I trials. The court's list of "identifiable defendants" was drawn from those defendants which did not respond to the plaintiffs' September 25, 1991

submission and which had not filed summary judgment motions on issues of conspiracy and concert of action. The court, however, reserved the right to amend the lists for good cause shown. The court's list contained Georgia–Pacific but not W.R. Grace.

Just five days later, on October 30, 1991, Georgia–Pacific responded with a motion for summary judgment on these issues. On November 8, 1991, W.R. Grace, although not then listed for the initial trial, filed its motion for summary judgment on these issues as well. The plaintiffs responded on the merits to both motions and did not question their timeliness.

For various reasons (including bankruptcy), most of the defendants' on the court's list in Pretrial Order 342 were inappropriate candidates for trial. In the plaintiffs' submission dated November 12, 1991, they therefore could select only seven of the twenty-two listed defendants, including Georgia–Pacific. The defendants, however, could not agree on which of them would stand trial first.

With matters in this posture, on November 29, 1991, the district court issued Pretrial Order 352, founded on its "discretionary powers," dismissing as untimely the pending motions for summary judgment by four of the seven companies on the plaintiffs' latest list of defendants for the Phase I trial, including Georgia–Pacific. The court explained in an accompanying memorandum opinion that, in its view, all defendants had long been on notice that the time for filing motions regarding Phase I "would soon come to an end," memorandum opinion at 2, and that Pretrial Orders 331 and 342 had put them "on notice that this matter was virtually on the eve of trial," id. at 4. The district court further

noted that, while a date for trial of Phase I had not been set, the court had called for a final pretrial conference. Thus, it concluded, consideration of these motions would unduly delay Phase I. Id.

On December 3, 1991, a pretrial conference was held at which February 3, 1992, was set for the commencement of jury selection in the first trial. At that conference, the district court also abandoned its list from Pretrial Order 342 and told the plaintiffs that they had until 5:00 p.m. the next day to select twelve defendants for trial. The plaintiffs did so and picked both W.R. Grace and Georgia–Pacific for the first trial of Phase I. On December 16, 1992, in Pretrial Order 356, the district court dismissed W.R. Grace's motion for summary judgment as untimely for the reasons outlined in Pretrial Order 352.

W.R. Grace and Georgia–Pacific thereupon filed petitions for writs of mandamus asking that we direct the district court to consider and decide their summary judgment motions on the merits so that they may avoid the expense of trial. The limited nature of this inquiry should be noted: the petitions do not request us to review the merits of the motions for summary judgment, but only their timeliness.

### B. Mandamus as a Remedy for Refusal to Consider a Summary Judgment Motion on the Merits

We first consider whether a writ of mandamus is a proper remedy when a district judge arbitrarily refuses to rule on a summary judgment motion, and we conclude that it is.[33]

As we noted above, the traditional use of mandamus is "to confine an inferior court to a lawful exercise of its prescribed juris-

---

**33.** Georgia Pacific has asserted that when a motions panel of this court allowed Judge Kelly to respond and set the case for disposition by a merits panel, it concluded that mandamus may lie. That assertion is frivolous. A motions panel's reference to a merits panel is on its face a decision not to decide anything, but rather to refer all issues, including threshold issues such as jurisdiction and availability of an extraordinary writ, to a merits panel. See Third Circuit Internal Operating Procedure 10.3.5 (if a mo-

tions panel does not grant a motion to dismiss an appeal for lack of jurisdiction, "the motion is referred by order, without decision and without prejudice, to the merits panel"). The same is true of our subsequent denial of the plaintiffs' motion for summary dismissal of all the petitions. Third Circuit Internal Operating Procedure 10.6 ("If a motion panel determines that summary action is not appropriate ... it may, in lieu of denial, refer the matter to the merits panel without decision and without prejudice.").

diction or to compel it to exercise its authority when it is its duty to do so," *Roche v. Evaporated Milk Association*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). In our view, a district court's failure to consider the merits of a summary judgment motion is a failure to exercise its authority when it has the duty to do so. Although the type of "authority" envisioned by the traditional statement of the rule was probably jurisdiction over an entire case (see, for example, *Will v. Calvert Fire Insurance Co.*, 437 U.S. 655, 661–62, 98 S.Ct. 2552, 2556–57, 57 L.Ed.2d 504 (1978)), we believe that the refusal to adjudicate a critical part of a case is comparable.

While mandamus is ordinarily inappropriate to review the merits of a denial of summary judgment, see, for example, *Communication Workers of America, AFL–CIO v. American Tel. & Tel. Co.*, 932 F.2d 199, 210 (3d Cir.1991), the present claims are different in kind. We recognize that in both situations the chief harm to the unsuccessful moving party is that it must bear the expense of going to trial. But whereas it is inevitable that judges will make mistakes from time to time when ruling on summary judgment motions, the error of refusing to rule on the merits of such a motion is entirely avoidable. Moreover, review after final judgment cannot force a district judge to adjudicate, and interlocutory appeal is unlikely to be available—a ruling that a motion is untimely because it will unduly delay trial ordinarily suggests that the district judge believes that its resolution would not "materially advance the ultimate determination of the litigation," as required for certification under 28 U.S.C. § 1292(b). See also *Edwards v. Cass County*, 919 F.2d 273, 276 (5th Cir.1990) (recognizing availability of mandamus in this situation but denying it on the facts of the case).

We therefore proceed to the merits of the petitions.

### C. *Timeliness Requirements for Summary Judgment Motions*

▄ Rule 56 contains few express time limitations. The relevant portions state:

Rule 56. Summary Judgment

(a) **For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, *at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party,* move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) **For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, *at any time,* move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) **Motion and Proceedings Thereon.** The motion shall be *served at least 10 days before the time fixed for the hearing.* The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought *shall* be rendered forthwith if the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

(emphasis added).

The plain text of the rule thus suggests that defendants may move for summary judgment "at any time," so long as at least ten days remain before trial in which to hold a hearing on the motion. The literal words of Rule 56 do not impose a general requirement of timeliness, nor do they indicate any discretion on the part of a district judge to deny a motion once the prerequisites are shown.

On the other hand, Rule 1 states that the rules of civil procedure "shall be construed to secure the just, speedy, and inexpensive determination of every action." We believe that to promote the Rules' purpose of efficient and fair disposition, a district judge must have considerable flexibility in

case and calendar management, including the authority to set reasonable time limits on the filing of summary judgment motions. These considerations are compounded in complex cases such as this. See *Manual for Complex Litigation, Second* § 21.34 ("[T]he judge at the initial conference (and at later conferences, as appropriate) should attempt to ascertain what issues are or may become appropriate for summary judgment and establish, at least tentatively, a schedule for filing and submitting such motions."); Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, 6A *Federal Practice and Procedure* § 1530 at 303–04 ("The general concern over protracted litigation led to increased pressure for the development of regularized procedures to be employed in every 'big case.' ").

 The petitioners do not seriously quarrel with these principles. They note, however, that in this case the district court had set no explicit deadline for summary judgment motions, nor a specific trial date. These factors make all the difference. The district court may well have been correct that resolution of these motions in December 1991 would not have advanced the litigation from an overall perspective. Phase I would still have had to proceed with the other defendants, and if the district court had had to deal with more than a handful of these motions, trial might have been delayed. But fairness to defendants is as much a policy of Rule 56 as are fairness to plaintiffs and the convenience to the district court. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986):

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

 Under the policy of Rule 56, movants are entitled to avoid the expense and tribulations of trial if they can prove that there is no triable issue. But if parties have been warned that they must move by a certain time and do not do so, they have waived their right to summary adjudication. Moreover, summary judgment motions within ten days of trial violate the plain words of Rule 56(c) and are unfair to opponents who may lack adequate time to respond. See *Beck v. Borden, Inc.*, 724 F.2d 44, 44–45 (6th Cir.1984) (per curiam); *Williams v. Howard Johnson's, Inc.*, 323 F.2d 102, 104–05 (4th Cir.1963). However, where, as here, parties are not given any deadline and do not violate the ten-day limitation of Rule 56(c), they cannot be said to have waived their right or to have been unfair to their opponents. District courts are entitled to broad deference regarding timeliness restrictions, but they are entitled to that deference only if they state those deadlines explicitly.

The dangers of not clearly setting deadlines in advance and the unfairness of imposing them retroactively are well illustrated here. According to the district court, W.R. Grace and Georgia–Pacific had long been on notice of the plaintiffs' claims and should not have waited until the "eve of trial" to file for summary judgment. But the proceedings with regard to the scope of Phase I were fluid from May 1990 to September 1991, and not until Pretrial Order 331 (September 5, 1991) were the plaintiffs required to specify the actions alleged to have been taken by each defendant in furtherance of a conspiracy or in concert of action. Moreover, the situation from September to December 1991 was rather confused. Lists of who was to be tried when were revised numerous times. We cannot fault these defendants for waiting to file motions for summary judgment until they knew specifically what they were supposed to have done and at what stage they were to face trial.

A motion for summary judgment could appropriately be dismissed where the movant has clearly engaged in calculated delaying tactics, but that was not the stated ground for denial, nor was it the case. In fact, both W.R. Grace and Georgia–Pacific

filed their motions quite promptly upon learning that they were slated to stand trial during the first stage of Phase I. Georgia–Pacific moved for summary judgment within five days of being named on the plaintiffs' revised list of trial defendants, and W.R. Grace filed its motion within six weeks of being named on the first list (and at a time when it was no longer on the revised list). Moreover, neither petitioner filed for summary judgment on the true "eve" of trial: the trial date later selected was three months away.

■ We therefore hold that, although a district court may impose reasonable time limitations on summary judgment motions for purposes of judicial economy and fairness, it acts with impermissible arbitrariness and in clear excess of its authority where, as here, it dismisses a summary judgment motion as untimely without having previously set deadlines for the filing of such motions. Of course, a district judge may, without advance warning, dismiss motions for summary judgment made within ten days of trial under the express terms of Rule 56(c), but that exception does not apply in this case. While the conclusions we have reached on these points are holdings because they are immediately binding on the parties and address rulings that otherwise would govern the case (i.e., they are not merely advisory), upon reflection we realize that we cannot issue a writ of mandamus to a non-party, the newly assigned district judge. Accordingly, no writ of mandamus will issue with respect to the future consideration of the motions for summary judgment. We are confident, however, that the newly assigned district judge will consider these motions for summary judgment in light of the principles announced in this case. We have not reviewed, and we make no comment on, the merits of those motions.

## VII. THE PETITIONS REGARDING THE PHASE I TRIAL PLAN

Finally, we turn to Petitions Nos. 92–1014 (filed jointly by Asten Group, Dana, Pfizer, Pittsburgh Corning, and W.R. Grace) and 92–1084 (filed by Kaiser Cement), which challenge different aspects of the district court's plan for the trial of Phase I.

### A. *Trying the Conspiracy and Concerted Action Claims First*

■ As just discussed, the district court decided that Phase I of the trial would cover only claims of conspiracy and concerted action. These claims are crucial to the class plaintiffs' overall strategy because they have had considerable difficulty specifically identifying which individual defendant's products appear in their schools. They therefore seek to hold all the defendants jointly liable on the theory that all defendants jointly conspired to conceal the dangers of asbestos and asbestos-containing products, thereby exacerbating the harm caused by any individual defendant's products. It appears that a desire to promote settlement motivated the district court to try this issue first: if the plaintiffs were to prevail in Phase I, the defendants would risk potentially massive liability were they also to lose at subsequent stages of litigation; if, on the other hand, the plaintiffs were to lose in Phase I, their position would be substantially weakened.

The gravamen of the joint petition is that the district court lacks jurisdiction to try the issue of conspiracy and concert of action before what petitioners claim is the logically prior issue of liability for the underlying tort. In the petitioners' view, no cognizable "case or controversy" exists because Phase I would try a hypothetical (or at least unripe) issue in that it would have to assume the outcome of a later trial. The petition also alleges that Phase I would violate the defendants' Seventh Amendment rights because different juries sitting for different phases would be deciding inextricably interwoven factual issues. Finally, the petitioners aver that the district court's plan will hopelessly confuse the jury.

In response, the plaintiffs point out that district courts have very broad discretion to order separate trials under Federal Rules of Civil Procedure 23 and 42(b), and that such orders are procedural, not jurisdictional, in nature. The district court, in its response to the petition, further explained that, contrary to the petitioners' intima-

tions, it intends to try the conspiracy/concerted action claims in relationship to an underlying tort—the tort of fraudulent concealment and misrepresentation. Both the district court and the plaintiffs also argue that, because no final decisions have been made regarding what future phases will entail, whether different juries will be empaneled, and what later juries might be told of earlier phases, the petitioners' Seventh Amendment claim is not ripe.

Fascinating though these issues appear to be, we will not reach any of them at this time, for we believe that they are no longer ripe in light of our decision to disqualify the district court. The petitioners should make their arguments first to the new presiding judge. He or she may have different views as to what procedure, consistent with constitutional limitations, will work best in trying this case. Depending on his or her ruling, the issues raised in the joint petition may become moot. Accordingly, we will dismiss, without prejudice, the petition asserting these Phase I claims. Should the issues reripen, any aggrieved parties may seek relief at that time by interlocutory appeal or by petition for an extraordinary writ, if either means is appropriate (an issue we similarly do not reach).

B. *Adjudicating the Case According to the Tort Standards of the Strictest Jurisdiction*

Throughout this litigation, an overriding concern of both the district court and this court has been the manageability of the class action. The defendants originally opposed class certification on the ground that because so many different state laws would have to be applied common issues could never predominate and the class action would be unmanageable. Counsel for the class plaintiffs repeatedly responded that the differences in state laws were not that great and that the plaintiffs were willing to prove their case according to the law of the "strictest" jurisdiction. Relying in part on those two representations, and on the possibility of certifying subclasses under Rule 23(c)(4), the district court certified the class. *In re Asbestos School Litigation,* 104 F.R.D. 422, 434 (E.D.Pa.1984). We affirmed that certification, albeit with explicit doubts about manageability and with the caveat that the district court could revoke the certification if that seemed appropriate. *In re School Asbestos Litigation,* 789 F.2d 996, 1010–11 (3d Cir.1986).[34]

The district court has ruled on a variety of summary judgment motions according to the laws of particular states. It is not entirely clear, however, how it intended to try the case to the jury. At the pretrial conference on December 3, 1991, the parties thrashed out the issue without clear result.[35] At that hearing, the district court expressed its inclination to think further about the matter. In Pretrial Order 353, however, issued that same day, the district court directed the plaintiffs to file a sub-

---

**34.** We did not, however, rely on the plaintiffs' representation regarding proofs according to the most stringent state law. We wrote:

> To meet the problem of diversity in applicable state law, class plaintiffs have undertaken an extensive analysis of the variances in products liability among the jurisdictions. That review separates the law into four categories. Even assuming additional permutations and combinations, plaintiffs have made a creditable showing, which apparently satisfied the district court, that class certification does not present insuperable obstacles. Although we have some doubt on this score, the effort may nonetheless prove successful.

789 F.2d at 1010 (footnote omitted).

**35.** Counsel for defendant United States Gypsum Company noted the plaintiffs' earlier representations and sought assurance that the district

court would enforce them. Plaintiffs' counsel, however, recast their earlier concession. They agreed that if one state required a "clear and convincing evidence" standard of proof rather than "preponderance of the evidence," they would have to meet the more difficult standard. But they also insisted on their right to try claims, such as that of concerted action, Restatement (Second) of Torts § 876, that not all jurisdictions recognize. They specifically refused to waive their right of appeal on this question and stated their preference that the district court mold state-by-state verdicts from special interrogatories. In their view, only a handful of interrogatories, not fifty-four, would be necessary because of the overlap in state laws. Various defendants took umbrage at the plaintiffs' change in position, even though the district court had been adjudicating motions on a state-by-state basis for several years.

mission stating the strictest jurisdiction's law on each element, and directed the defendants to respond. The district court further declared that the standard of proof would be "clear and convincing evidence." At the same time, however, the plaintiffs were also directed to file proposed interrogatories that presumably would be used to mold the jury's verdict to the law of each jurisdiction.

The parties filed their submissions while continuing their heated debate. When the district court stayed proceedings in light of other pending petitions for mandamus, it had yet to issue a definitive ruling on the issue. Following the district court's suggestion that the parties file any lurking mandamus petitions, Kaiser Cement filed petition No. 92–1084. That petition alleges that the district court plans to try the case according to the law of the strictest state, rather than according to the law of each individual jurisdiction, and that the district court's approach runs afoul of the Supreme Court's ruling in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

*Shutts* held that due process requires that in a class action based on the laws of separate jurisdictions the adjudicating court must apply to any particular claim the substantive law of a jurisdiction having a significant interest in that claim. See id. at 814–23, 105 S.Ct. at 2976–80. Courts may not simply apply the law of the forum state or, presumably, a hybrid or composite of state laws. Thus, *Shutts* suggests that each plaintiff in this case has the right to have its claims judged according to the law of its jurisdiction, not according to that of a putative or imaginary strictest state.

■ At first blush, one might question why Kaiser Cement, a defendant, has standing to raise this objection. After all, the strictest-state standard appears to make the plaintiffs' case more difficult to prove, and, thus, to advantage the defendants. Kaiser Cement's concern, however, is that even if it wins against the class plaintiffs, and even if the *class plaintiffs* have waived their *Shutts* claim, its victory will be hollow because *absent class mem-*

*bers* from more "lenient" jurisdictions will be able to challenge the judgment collaterally. Kaiser Cement notes that the opt-out notice did not inform the class members that they were waiving their right to have their claims adjudicated according to their own states' (possibly more lenient) laws, and that they therefore could claim inadequate representation by the class plaintiffs. According to the petition, the current trial plan binds Kaiser Cement if it loses, but does not bind absent plaintiffs if it wins. Kaiser Cement thus views trial as unwinnable from a practical standpoint and, hence, fundamentally unfair, in violation of both Rule 23 and the Due Process Clause.

■ We agree that Kaiser Cement has standing to raise this claim, but we do not believe that the issue is ripe for our adjudication. First, it is far from clear how the district court intended to resolve issues other than the standard of proof. Second, even if the district court had taken a clear position on what law to apply, a new district judge will now be presiding over the case. If the newly assigned district judge insists on holding the class plaintiffs strictly to their earlier representations, then they or the defendants may seek review from this court at that time.

We expect that that will not prove necessary, however. Despite the barbs that have been traded and the parties' penchant for painting each other with black hats, it appears that both the class plaintiffs and the defendants agree, for different reasons, that *Shutts* requires the district court to apply the law of the individual jurisdictions. The plaintiffs believe that the case will be manageable if issues are put to the jury according to special interrogatories with the district court later molding the verdict according to the law of each state. The defendants continue to believe that such an approach will be unmanageable, and they therefore desire to have the class action decertified. As we stated in our earlier opinion, however, we believe that the district court will be in a much better position to evaluate and handle such manageability concerns initially, and at this stage we again prefer to defer to its judg-

ment. For now, we simply urge the incoming district judge to examine *Shutts* carefully before submitting the case to the jury according to the law of a hypothetical strictest state, even if the class plaintiffs once agreed to that approach.

## VIII. SUMMARY

Petition No. 91–1887 (by Pfizer) will be granted. Petitions Nos. 91–1943 (by ACandS) and 91–1981 (by Asten Group) will be granted to the extent that they seek disqualification of Judge Kelly and denied to the extent that they seek vacatur of specific pretrial orders. The new presiding judge may, but need not, reconsider discretionary rulings regarding the structure of the impending trial. The following writ shall issue:

> The Honorable James McGirr Kelly shall disqualify himself from presiding over further proceedings in any matter concerning the cases in Master File 83–0268 of the District Court of the Eastern District of Pennsylvania, and a different judge shall be appointed to preside over these cases.

Petition No. 91–1917 (by Kaiser Cement) will be denied. Nevertheless, to avoid any appearance of impropriety or any accidental actual impropriety, we strongly recommend that the newly assigned district judge delegate the responsibility for reviewing the plaintiffs' requests for use of escrowed settlement funds to a magistrate judge or special master not otherwise involved in the litigation.

Although we hold both that a petition for mandamus is a proper vehicle by which to require a district court that has refused to consider the merits of an issue to do so and that a district court may refuse to consider the merits of a summary judgment motion on grounds of untimeliness only if it has previously set reasonable time limits on the filing of motions for summary judgment or if the filing of the motion violates the express terms of Federal Rule of Civil Procedure 56(c), we cannot issue a writ of mandamus to Judge Kelly ordering him to consider the motions for summary judgment since he will no longer be presiding over this case. While the conclusions we have reached on these points are holdings because they are immediately binding on the parties and address rulings that otherwise would govern the parties in this case (i.e., they are not merely advisory), we cannot issue a writ of mandamus to a non-party. Accordingly, no writ of mandamus will issue with respect to the future consideration of the motions for summary judgment.

Petitions Nos. 92–1014 (by Asten Group, Dana, Pfizer, Pittsburgh Corning, and W.R. Grace) and 92–1084 (by Kaiser Cement) will be denied as unripe as a result of our decision to disqualify Judge Kelly. This ruling is without prejudice to any defendant's right to reraise these issues should they reripen upon the new presiding judge's adoption of a trial plan.

The mandate shall issue forthwith. The parties shall bear their own costs.